NO. _____

---

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

*IN RE LIBERTY COUNSEL, INC. and RENA M. LINDEVALDSEN,
Individually and as Alleged Agent of Liberty Counsel, Inc.,*

*Petitioners*

---

**PETITION FOR WRIT OF MANDAMUS**
**to the United States District Court for the District of Vermont**
**Honorable William K. Sessions, III**
**Case No. 2:12-cv-000184-wks**

---

Horatio G. Mihet
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: hmihet@LC.org
dschmid@LC.org
court@LC.org

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………i

TABLE OF AUTHORITIES……………………………………………………iv

CORPORATE DISCLOSURE STATEMENT…………………………….…...viii

RELIEF SOUGHT……………………………………………………………1

ISSUES PRESENTED………………………………………………………..2

INTRODUCTION……………………………………………………………..2

FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED…………4

I.      Jenkins and Miller's Settlement Agreement Releases Jenkins Claims
        against All Miller's Agents, including Liberty Counsel and Lindevaldsen….4

A.      Mutual Release Provision……..……………………………………..4

B.      Choice of Law Provision……………………………………………..5

C.      Entire Agreement Provision…………………………………………..5

D.      Reliance on Own Counsel Provision…………………………………6

II.     Jenkins Identifies Liberty Counsel and Lindevaldsen as Miller's Legal
        Agents, and the District Court Acknowledged It……………………………..6

        A.      Jenkins's Complaint Alleges that Liberty Counsel and Lindevaldsen
                are Miller's Legal Agents……………………………………………..6

        B.      The District Court Acknowledged Jenkins's Identification of Liberty
                Counsel and Lindevaldsen as Miller's Legal Agents…………………7

        C.      The Settlement Agreement Itself Identifies Liberty Counsel and
                Lindevaldsen as Miller's Legal Agents……………………………..8

D.     Despite the Unambiguous Statements of the Settlement Agreement, the District Court Refused to Dismiss Petitioners………………………..8

REASONS WHY THE PETITION SHOULD BE GRANTED……………………9

I.     PETITIONERS HAVE A CLEAR AND INDISPUTABLE RIGHT TO RELIEF……………………………………………………………………..10

A.     The District Court Exceeded the Lawful Bounds of its Subject-Matter Jurisdiction Because the Settlement Agreement Moots the Claims against Petitioners…………………………………………...10

1.     Settlement agreements moot claims and end live controversies………………………………………………10

2.     Federal courts have no subject-matter jurisdiction over moot claims……………………………………………………12

3.     Jenkins' settlement and release with Miller and her agents moots Jenkins' claims against Petitioners and deprives the district court of subject-matter jurisdiction……………………13

B.     Jenkins's Release of Miller's Agents Must Be Enforced Under Vermont Contract Law in Accordance with It's Plain, Unambiguous Terms…………………………………………………………...16

1.     Settlement agreements and releases are governed by contract law and, where not ambiguous, must be enforced according to their plain meaning…………………………………………16

2.     A court may not consider extrinsic evidence to interpret a contract where the terms used by the parties are unambiguous..17

C.     Jenkins's Release of Miller's Agents Must Be Enforced as Written Because the Term "Agents" Has a Plain and Ordinary Meaning and Is Not Ambiguous…………………………………………………20

D.    The District Court's Rewriting of the Release's Unambiguous Terms Based on Extrinsic Evidence of the Parties' Purported Intent Was Legal Error and a Usurpation of Authority……………………………...25

II.    PETITIONERS HAVE NO OTHER ADEQUATE MEANS TO OBTAIN THE RELIEF THE CONSTITUTION DEMANDS……………..28

A.    Petitioners Have Exhausted All Other Available Alternatives………28

B.    Petitioners Would Suffer Irreparable Harm Absent Mandamus Relief………………………………………………………………...29

III.    MANDAMUS RELIEF IS APPROPRIATE UNDER THE CIRCUMSTANCES……………………………………………………..30

CONCLUSION……………………………………………………………...31

iii

# TABLE OF AUTHORITIES

## CASES

*Agee v. Paramount Commc'ns, Inc.*, 114 F.3d 395 (2d Cir. 1997)…………………12

*Agency of Nat. Res. v. Towns*, 724 A.2d 1022 (Vt. 1998)…………………………..14

*Alpine Fresh, Inc. v. Washburn*, 77 So.3d 765 (Fla. 3d DCA 2011)……………….23

*Atlas One Fin. Grp., LLC v. Alarcon*, No. 12-23400-Civ.,
2015 WL 1191211 (S.D. Fla. 2015)……………………………………………..23

*Aulenback, Inc. v. Fed. Hwy. Admin.*, 103 F.3d 156 (D.C. Cir. 1997)………………12

*Bd. of Trustees of Florida Atl. Univ. v. Bowman*,
853 So.2d 507 (Fla. 4th DCA 2003) ……………………………………………23

*Berkshire Bank v. Kelly*, 2023 WL 188386 (Vt. Jan. 13, 2023)……………………..14

*Brandow Chrysler Jeep Co. v. Datascan Tech.*, No. 06-5093,
2008 WL 4274494 (E.D. Penn. Sept. 17, 2008)……………………………..23, 24

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016)……………………………..11

*Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367 (2004)………..9, 10

*Collings v. Harrison-Bode*, 303 F.3d 429 (2d Cir. 2002)…………………………..16

*Cross-Abbott Co. v. Howard's, Inc.*, 207 A.2d 134 (Vt. 1965)……………………..18

*Downtown Barre Dev. v. C&S Wholesale Grocers, Inc.*,
857 A.2d 263 (Vt. 2004)…………………………………………………………...18

*Duncan v. Poythress*, 777 F.2d 1508 (11th Cir. 1985)……………………………..21

*Economou v. Economou*, 399 A.2d 496 (1979)…………………………………….17

*EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002)…………………………………11

iv

*Elrod v. Burns*, 427 U.S. 347 (1976)……………………………………………30

*Farmers Auto Ins. Ass'n v. Wroblewski*,
887 N.E.2d 916 (Ill Ct. App. 2008)……………………………………………...22

*Fox v. Bd. of Trustees of State Univ. of N.Y.*, 42 F.3d 135 (2d Cir. 1994)………..1, 13

*Fox v. Boucher*, 794 F.2d 34 (2d Cir. 1986)…………………………………..29

*Funds for Animals v. Babbitt*, 89 F.3d 128 (2d Cir. 1996)……………………….13

*Genesis Software Sys., Inc. v. Ceridian Corp.*, No. 1:14-CV-2658-MHC,
2016 WL 4357513 (N.D. Ga. Jan. 25, 2016)………………………………….23

*Hernandez ex rel. Gonzalez v. Tapia*, No. 10-CV-4124,
2010 WL 5232942 (N.D. Ill. Dec. 15, 2010)………………………………….22

*Horizon Fin., F.A. v. Hansen*, 791 F. Supp. 1561 (N.D. Ga. 1992)……………...23

*In re The City of New York*, 607 F.3d 923 (2d Cir. 2010)………………………10, 30

*In re Roman Catholic Diocese of Albany*, 745 F.3d 30 (2d Cir. 2014)………..*passim*

*In re World Trade Ctr. Lowe Manhattan Disaster Site Litig.*
828 F. App'x 734 (2d Cir. 2020)…………………………………………...11

*Inv. Props., Inc. v. Lyttle,* 739 A.2d 1222 (1999)…………………………..20

*Isbrandtsen v. North Branch Corp.*, 556 A.2d 81 (Vt. 1988)………17, 18, 19, 25, 26

*Gould v. Control Laser Corp.*, 866 F.2d 1391 (Fed. Cir. 1989)……………………12

*Jacobs v. Not-For-Profit Hosp. Corp.*, 285 F. Supp. 3d 316 (D.D.C. 2018)…...12, 13

*Jenkins v. Miller*, No. 2:12-cv-184,
2017 WL 1052582 (D. Vt. Mar. 20, 2017)…………………………………8, 14

*Jenkins v. Miller*, 983 F. Supp. 2d 423 (D. Vt. 2013)……………………………8, 14

*Judge Dev. Corp. v. Bank of New York*, 814 F. Supp. 384 (D. Vt. 1993)………….19

*Kipp v. Estate of Chips*, 732 A.2d 127 (Vt. 1999)……………………………………18

*Kugler v. LexisNexis Occupational Health Solutions, Inc.*,
16 F. Supp. 3d 999 (E.D. Wis. 2014)……………………………………...22, 24, 25, 28

*LaForest v. Honeywell Int'l, Inc.*, 569 F.3d 69 (2d Cir. 2009)……………………..11

*Lake Coal Co., Inc. v. Roberts & Schaefer Co.*, 474 U.S. 120 (1985)……………..11

*Leo v. Hillman*, 665 A.2d 572 (Vt. 1995)……………………………………………..16

*Linde v. Arab Bank, PLC*, 706 F.3d 92 (2d Cir. 2013)…………………………29, 30

*Long Island Lighting Co. v. Cuomo*, 888 F.2d 230 (2d Cir. 1989)………1, 11, 13, 15

*Microsoft Corp. v. Bristol Tech., Inc.*, 250 F.3d 152 (2d Cir. 2001)………………..11

*Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009)…………………………….31

*Okemo Mountain, Inc. v. U.S. Sporting Clays Ass'n*,
376 F.3d 102 (2d Cir. 2004)……………………………………………………..19

*Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437 (2d Cir. 2005)…………………..16

*Polsky v. BDO Seidman*, 688 N.E.2d 364 (Ill. Ct. App. 1997)……………………..22

*Rogers v. Rogers*, 373 A.2d 507 (Vt. 1977)………………………………………..16

*Schecter v. Eagle, S.A. Funding Co.*, No. CV 90-0324 (ADS),
1990 WL 92712 (E.D.N.Y. June 26, 1990)……………………………………...17

*Scott v. State*, 256 A.3d 105 (Vt. 2021)……………………………………*passim*

*S.E.C. v. Rajaratnam*, 622 F.3d 159 (2d Cir. 2010)………………………………..29

*Solis v. 666 Fifth Assoc. LLC*, No. 20 Civ. 5105 (AKH),
2021 WL 5998416 (S.D.N.Y. Dec. 20, 2021)…………………………….12, 17

*Stein v. KPMG, LLP*, 486 F.3d 753 (2d Cir. 2007)………………………………10

*Tilley v. Green Mountain Power Corp.*, 587 A.2d 412 (Vt. 1991)…………………19

*Toensing v. Attorney General of Vermont*, 212 A.3d 180 (Vt. 2019)………………21

*Tromp v. City of New York*, 465 F. App'x 50 (2d Cir. 2012)………………….…17

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S 18 (1994)………………11

*U.S. Dep't of Justice v. Hudson*, 626 F.3d 36 (2d Cir. 2010)……………………….21

*United States v. City of New York*, 972 F.2d 464 (2d Cir. 1992)……………………13

*Whitney v. Vermont Mutual Ins. Co.*, 135 A.3d 272 (Vt. 2015)……………………18

## STATUTES

28 U.S.C. §1651……………………………………………………………………1, 9

Fed. R. App. P. 21………………………………………………………………...1

Fed. R. App. P. 26.1………………………………………………………………viii

## OTHER

13B Wright & Miller, *Fed. Prac. & Proc.* §3533.2 (2023)………………………12

*Black's Law Dictionary* 147 (9th ed. 2009)………………………………………..21

Restatement (Third) of Agency §1.01………………………………………….20, 21

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Petitioners Liberty Counsel, Inc. and Rena M. Lindevaldsen state that Liberty Counsel, Inc. has no parent corporation, is not publicly traded, and no publicly held corporation owns ten (10) percent or more of its stock.

# RELIEF SOUGHT

Petitioners, Liberty Counsel, Inc. and Rena M. Lindevaldsen, pursuant to 28 U.S.C. § 1651 and Fed. R. App. P. 21, petition for a writ of mandamus directing the Honorable William K. Sessions III of the United States District Court for the District of Vermont to vacate his Order (Exhibit 1, dkt. 731, Opinion and Order) denying Petitioners' Moton to Dismiss for lack of subject-matter jurisdiction (dkt. 718) and dismiss all claims against Petitioners for lack of subject-matter jurisdiction.

The plaintiff in the action below entered into a settlement agreement with Defendant Lisa Miller, releasing all claims against Miller **and her agents** (Exhibit 2, dkt. 718-1, "Settlement Agreement"), which necessarily includes Petitioners. The Settlement Agreement mooted the live controversy between Plaintiff and Petitioners and instantly divested the district court of subject-matter jurisdiction as a matter of law. A settlement "agreement clearly renders this case moot," *Long Island Lighting Co. v. Cuomo*, 888 F.2d 230, 233 (2d Cir. 1989), and "when a case becomes moot, the federal courts lack subject matter jurisdiction over the action," *Fox v. Bd. of Trustees of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994) (cleaned up). The district court's refusal to dismiss moot claims is an unconstitutional usurpation of the court's prescribed jurisdiction. The Petition should be granted.

## ISSUES PRESENTED

Whether the district court exceeded the lawful bounds of its prescribed jurisdiction by refusing to dismiss claims mooted by an unambiguous settlement agreement that released those claims against Petitioners and, therefore, divested the district court of subject-matter jurisdiction.

## INTRODUCTION

On March 20, 2023, Plaintiff Janet Jenkins and Defendant Lisa Miller entered into a Confidential Settlement Agreement and Release (Ex. 2, Settlement Agreement). In the Settlement Agreement, Jenkins and Miller agreed to settle their dispute and to release all claims against Miller **and her agents**. The Settlement Agreement's release of all claims against Miller's agents necessarily includes Petitioners Liberty Counsel and Lindevaldsen, as there can be no dispute that Petitioners—**as Miller's lawyers**—were her legal agents. Even the district court's order below recognized that Petitioners were Miller's agents. (Ex. 1, dkt. 731 at 3.) Because the claims against Petitioners have been released, the case is moot as to them. And, as a matter of law, the district court's subject-matter jurisdiction was divested at the moment of the release. But, on August 16, 2023, the district court refused to dismiss the action against Petitioners, concluding that the unambiguous terms of the Settlement Agreement do not mean what they say. (Ex. 1, dkt. 731, at 8.) Instead of holding the parties to what they actually said, the district court departed

from clearly established law and consulted circumstances outside the plain language of the Settlement Agreement and its execution to conclude that the parties could not have meant what they said, effectively rewriting the agreement to benefit Jenkins. This is not the law.

While the abstract goal of contract interpretation is "effectuating the parties' intent," *Scott v. State*, 256 A.3d 105, 110 (Vt. 2021), the concrete goal is effectuating what the parties **said**. *See id.* ("When the language of a release is clear, we presume it reflects that intent.") Here, the scope of Jenkins's release in her Settlement Agreement with Miller can be determined by answering a simple question: **Whom** did Jenkins **say** she released? The answer is likewise simple: Jenkins **said** she released Miller, "to include [her] **agents**." (Ex. 2, dkt. 718-1, at 5 (emphasis added).) Released from what? "[A]ll known and unknown" claims, "to include, but not limited to, all claims in or in any way related to the Lawsuit" and "no matter how characterized." (Ex. 2, dkt. 718-1, at 5–6.) As used in the release, the term "agents" is unambiguous. The Settlement Agreement's plain, ordinary meaning includes Petitioners Liberty Counsel and Lindevaldsen, and the district court usurped its authority by refusing to dismiss claims over which it no longer possesses subject-matter jurisdiction.

**FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED**

**I. Jenkins and Miller's Settlement Agreement Releases Jenkins's Claims Against Miller's Agents, Including Liberty Counsel and Lindevaldsen.**

In the Settlement Agreement (Ex. 2, dkt. 718), Miller and Jenkins agreed, *inter alia*, to the following relevant provisions:

**A. Mutual Release Provision.**

Section 5 of the Settlement Agreement, the Mutual Release provision, states:

> The Parties, on behalf of themselves, their successors, heirs, administrators, executors, or assigns, hereby release and discharge the other Party, **to include the other Party's agents** and assignees, from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, medical costs, pain and suffering, mental anguish, emotional distress, expenses (including attorneys' fees and costs actually incurred), and punitive damages, of any nature whatsoever, known or unknown, which either Party has, or may have had, against the other Party, whether or not apparent or yet to be discovered, to include, but not limited to, all claims in or in any way related to the Lawsuit. This Agreement resolves any claim for relief that is, or could have been alleged, no matter how characterized, including, without limitation, compensatory damages, damages for breach of contract, bad faith damages, reliance damages, liquidated damages, damages for humiliation and embarrassment, punitive damages, costs, and attorneys' fees related to or arising from the Lawsuit. Notwithstanding any language to the contrary, this release does not release any claims related to the Parties' rights and obligations under this Agreement.

(Ex. 2, dkt. 718-1, Settlement Agreement at 5-6, § 5 (emphasis added).)

**B. Choice of Law Provision.**

Section 7 of the Settlement Agreement includes a Choice of Law provision making Vermont the relevant jurisdiction for both interpretation and enforcement of the Settlement Agreement. The Choice of Law provision states,

> This Agreement shall be subject to, and construed in accordance with, the laws of the State of Vermont. The Parties agree that any dispute or action relating to this Agreement shall be litigated in the United States District Court for the District of Vermont, and the Parties hereby irrevocably submit to the jurisdiction thereof with respect to the interpretation and enforcement of this Agreement.

(Ex. 2, dkt. 718-1, Settlement Agreement at 7, § 7.)

**C. Entire Agreement Provision.**

Section 9 of the Settlement Agreement provides that Miller and Jenkins intend the Settlement Agreement to be a complete compromise and settlement of the claims included in the Settlement Agreement. It states,

> This Agreement is intended to be a complete compromise and settlement of claims that are the subject of genuine, bona fide disputes among the Parties. All prior representations, commitments, and understandings between the Parties regarding the subject matter of this Agreement are merged into and replaced by this Agreement. The Parties understand that this settlement is a compromise of disputed claims and defenses, and that the performance of the Parties under this Agreement is not to be construed as an admission of liability of any kind or any character on the part of any party, by which any liability or obligation is expressly denied. This Agreement, and the covenants and promises contained herein, are made by the Parties only to compromise and settle their disputes, to avoid the uncertainty and expense of litigation, and to buy peace.

(Ex. 2, dkt. 718-1, Settlement Agreement at 7, §9.)

**D. Reliance on Own Counsel Provision.**

Section 11 of the Settlement Agreement provides that Miller and Jenkins relief exclusively on their own counsel and that the Settlement Agreement is based upon their reliance on counsel. It states,

> The Parties each warrant and covenant that this Agreement has been carefully read by each of them, is fully understood, and has been executed with full knowledge of its significance. The Parties acknowledge that each has made a full and complete investigation of the circumstances surrounding this matter. The Parties also acknowledge that they have been represented by independent legal counsel in this dispute and in the negotiation of the terms of this Agreement, that they have had an adequate amount of time to consider whether to sign this Agreement, and that they do so on the basis of independent legal advice and of their own free will, without duress or coercion of any kind, and that neither of them have relied upon any statement made orally or in writing by any other Party or by any attorney of any other Party, and that the statements, representations, warranties, and agreements made in this Agreement reflect and constitute the entire agreement of the Parties as to the matters addressed in this Agreement.

(Ex. 2, dkt. 718-1, Settlement Agreement at 7-8, §11.)

## II. Jenkins Identifies Liberty Counsel and Lindevaldsen as Miller's Legal Agents, and the District Court Acknowledged It.

### A. Jenkins's complaint alleges that Liberty Counsel and Lindevaldsen are Miller's legal agents.

Jenkins, herself, can hardly argue that she misunderstood the agency relationship Liberty Counsel and Lindevaldsen had with Miller. She explicitly alleged the agency relationship created by their representation of Miller throughout her complaint and

alleged that many of Liberty Counsel's and Lindevaldsen's alleged actions were on behalf of Miller, **as her agents**. Jenkins's Revised Second Amended Complaint ("RSAC") specifically alleges the agency relationship numerous times. For example, Jenkins alleges in paragraph 21: "Lisa Miller's lead attorneys were Dean of the Law School Mathew Staver, and Rena Lindevaldsen, a law professor there."  (Dkt. 223, RSAC, ¶ 21). The complaint alleges that Liberty Counsel and Lindevaldsen acted "on behalf of Lisa Miller." (RSAC, ¶ 26 (alleging "Lisa Miller's attorneys had established a Facebook site and other social media to solicit donations to their organization **on behalf of Lisa Miller**" (emphasis added); *see also* RSAC, ¶ 31 (alleging Staver and Lindevaldsen were attorneys for Miller), ¶ 46 (allegation concerning "Lisa Miller's communications with her lawyer, Rena Lindevaldsen"), ¶ 40 (alleging Lisa Miller's attorneys at Liberty Counsel "persisted in filing an appeal in the Vermont Supreme Court **on Lisa Miller's behalf**" (emphasis added)), ¶ 57 (alleging Liberty Counsel's lawyers represented Lisa Miller at various hearings), ¶ 61 (allegations regarding "Lisa Miller's attorneys, Mathew Staver and Rena Lindevaldsen" who "press[ed] appeals **on Lisa Miller's behalf**" (emphasis added)).

## B. The District Court Acknowledged Jenkins's Identification of Liberty Counsel and Lindevaldsen as Miller's Legal Agents.

In its prior orders, including the order at issue in this Petition, the district court acknowledged the obvious: Petitioners acted as Miller's legal representatives—*i.e.*,

agents—throughout the time in question. *See, e.g.*, *Jenkins v. Miller*, No. 2:12-cv-184, 2017 WL 1052582, at *9 (D. Vt. Mar. 20, 2017) (noting Jenkins's assertion that Petitioners were "Miller's lead attorneys"); *Jenkins v. Miller*, 983 F. Supp. 2d 423, 446–47 (D. Vt. 2013) (discussing Petitioners' "representing" Miller in the Vermont litigation). (*See also* Ex. 1, dkt. 731, at 3 ("There is no dispute that Liberty Counsel and Lindevaldsen allegedly served as Lisa Miller's counsel.").)

## C. The Settlement Agreement Itself Identifies Liberty Counsel and Lindevaldsen as Miller's Legal Agents.

In Exhibit B to the Settlement Agreement, the Limited Attorney-Client Privilege Waiver, Jenkins and Miller identify Liberty Counsel and Lindevaldsen as Miller's agents: "Lisa Miller ('Miller') voluntarily offers a limited waiver of her attorney-client privilege, and agrees not to assert her attorney-client privilege, in relation to the representation of her by Liberty Counsel or Rena M. Lindevaldsen . . . ." (Ex. 2, dkt. 718-1, Settlement Agreement, Exhibit B, at 1, ¶ 1.)

## D. Despite Acknowledging Petitioners' Agency and the Unambiguous Terms of the Settlement Agreement, the District Court Refused to Dismiss Petitioners.

Despite the plain and unequivocal statements in the Settlement Agreement that Jenkins was releasing Miller **and her agents**, and despite Jenkins's undeniable knowledge that Petitioners were Miller's agents, the district court nevertheless concluded that Jenkins could not have intended to release Petitioners—**despite what she said**. (Ex. 1, dkt. 731, at 3–4.) Indeed, the district court recognized the obvious

(*i.e.*, "There is no dispute that Liberty Counsel and Lindevaldsen allegedly served as Lisa Miller's counsel" (Ex. 1, dkt. 731 at 3)) and did not find the term "agents" to be ambiguous (*i.e.*, susceptible to more than one reasonable interpretation). Rather, contrary to black-letter contract law, the court credited after-the-fact statements, extrinsic to both the Settlement Agreement and its making, to simply exclude Petitioners from the term "agents" despite its plain, unambiguous meaning. (Ex. 1, dkt. 731, at 7–8 ("the Court finds that the reference to 'agents' does not include movants").) Thus, not only did the district court improperly resort to parol evidence in the face of unambiguous terms, it skipped over the ambiguity analysis altogether and simply rewrote the agreement to favor Jenkins. The court's decision represents a clear usurpation of power and abuse of discretion.

### REASONS WHY THE PETITION SHOULD BE GRANTED

"The All Writs Act empowers 'all courts established by Act of Congress' to 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'" *In re Roman Catholic Diocese of Albany, New York, Inc.*, 745 F.3d 30, 35 (2d Cir. 2014) (quoting 28 U.S.C. §1651(a)). "The traditional use of the writ in aid of appellate jurisdiction both at common law and in the federal courts has been to confine the court against which mandamus is sought to a lawful exercise of its prescribed jurisdiction." *Cheney v. U.S. Dist. Ct.*

*for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (cleaned up). There are three conditions that must be satisfied to warrant issuance of the writ:

> (1) the party seeking issuance of the writ must have no other adequate means to attain the relief it desires; (2) the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances; and (3) the petitioner must demonstrate that the right to issuance of the writ is clear and indisputable.

*In re The City of New York*, 607 F.3d 923, 932–33 (2d Cir. 2010) (cleaned up). Petitioners satisfy all three.

## I. PETITIONERS HAVE A CLEAR AND INDISPUTABLE RIGHT TO RELIEF.

The "right to a writ of mandamus is clear and indisputable [when] the district court's exercise of [jurisdiction] amounted to a clear abuse of discretion, if not a judicial usurpation of power." *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 41 (2d Cir. 2014). And, where the district court refuses to relinquish a case over which it has no subject matter jurisdiction, mandamus relief is warranted. *See Stein v. KPMG, LLP*, 486 F.3d 753, 759 (2d Cir. 2007) (granting writ of mandamus and dismissing the complaint against Petitioners "[b]ecause the actions of the district court were well outside its subject matter jurisdiction"). The same is true here, and the writ should issue.

10

**A. The District Court Exceeded the Lawful Bounds of its Subject-Matter Jurisdiction Because the Settlement Agreement Moots the Claims against Petitioners.**

**1. Settlement agreements moot claims and end live controversies.**

As the Supreme Court has confirmed numerous times, settlement moots the underlying action. *See, e.g.*, *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S 18, 26 (1994) ("It is true, of course, that respondent agreed to the settlement that caused the mootness."); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165 (2016) (noting that, in prior cases, "the settlement made the dispute moot"); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("employee's settlement rendered his personal claims moot"); *Lake Coal Co., Inc. v. Roberts & Schaefer Co.*, 474 U.S. 120, 120 (1985) (noting the complete settlement of the relevant claims and remanding with instructions to dismiss the action as moot).

This Court, too, has observed the constitutional principle that a settlement of the claims moots an action. *See, e.g.*, *LaForest v. Honeywell Int'l, Inc.*, 569 F.3d 69, 74 (2d Cir. 2009) ("All disputes regarding the underlying merits of the action have been rendered moot by the settlement."); *Microsoft Corp. v. Bristol Tech., Inc.*, 250 F.3d 152, 154 (2d Cir. 2001) ("settlement moots the controversy" (cleaned up)); *Long Island Lighting Co. v. Cuomo*, 888 F.2d 230, 233 (2d Cir. 1989) ("Pursuant to the Settlement Agreement, the parties to this appeal have agreed to terminate their litigation. **Such an agreement clearly renders this case moot**." (emphasis added));

*In re World Trade Ctr. Lowe Manhattan Disaster Site Litig.* 828 F. App'x 734, 736 (2d Cir. 2020) ("Because a settlement resolves the live controversy between parties, we have recognized that a settlement agreement may moot a party's subsequent claims."); *Agee v. Paramount Commc'ns, Inc.*, 114 F.3d 395, 399 (2d Cir. 1997) (holding matter was "rendered moot by [the parties'] March 1996 settlement"); *see also Solis v. 666 Fifth Assoc. LLC*, No. 20 Civ. 5105 (AKH), 2021 WL 5998416, at *3 (S.D.N.Y. Dec. 20, 2021) (noting that a settlement moots the claims); *Aulenback, Inc. v. Fed. Hwy. Admin.*, 103 F.3d 156, 161 (D.C. Cir. 1997) ("The general rule, however, is that complete settlement moots an action."); *Gould v. Control Laser Corp.*, 866 F.2d 1391, 1392 (Fed. Cir. 1989) ("Settlement moots an action."); *Jacobs v. Not-For-Profit Hosp. Corp.*, 285 F. Supp. 3d 316, 318 (D.D.C. 2018) ("The existence of a valid settlement agreement generally moots a legal action between the parties to the agreement . . . .").

And where, as here, a settlement agreement releases all claims against only certain defendants and their agents, that "partial settlement moots the settled claims." 13B Wright & Miller, *Fed. Prac. & Proc.* §3533.2 (2023).

### 2. Federal courts have no subject-matter jurisdiction over moot claims.

Article III, section 2 of the United States Constitution limits the federal judicial power to enumerated cases and controversies. Moot cases no longer present live controversies, and therefore federal courts have no jurisdiction to decide them."

12

*Long Island Lighting*, 888 F.2d at 233. "The existence of a real case or controversy is an irreducible minimum of the jurisdiction of federal courts." *United States v. City of New York*, 972 F.2d 464, 469 (2d Cir. 1992). "A case is moot, and accordingly the federal courts have no jurisdiction over the litigation, when the parties lack a legally cognizable interest in the outcome." *Fox v. Bd. of Trustees of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994). And "[a] case or controversy becomes moot either when the injury is healed and only prospective relief has been sought, or when it becomes impossible for the courts to redress the injury through the exercise of their remedial powers." *Funds for Animals v. Babbitt*, 89 F.3d 128, 133 (2d Cir. 1996). "Federal courts lack jurisdiction over a matter that has settled because, after settlement, the matter does not present an actual controversy suitable for judicial resolution." *Jacobs*, 285 F. Supp. 3d at 318.

### 3. Jenkins's settlement and release with Miller and her agents moots Jenkins's claims against Petitioners and deprives the district court of subject-matter jurisdiction.

Here, Jenkins' Settlement Agreement with Miller releases all of Jenkins' claims against Miller and all of her agents. It states,

> The Parties . . . hereby release and discharge the other Party, **to include the other Party's agents** and assignees, from all known and unknown [claims] of any nature whatsoever, known or unknown, which either Party has, or may have had, against the other Party . . . to include, but not limited to, all claims in or in any way related to the Lawsuit. This Agreement resolves any claim for relief that is, or could have been alleged, no matter how characterized . . . related to or arising from the Lawsuit.

13

(Ex. 2, Settlement Agreement at 5–6, § 5 (emphasis added).)

There can be no dispute that Jenkins and Miller agreed to the release of all claims against Miller and her agents. And, as attorneys for Miller, Liberty Counsel and Lindevaldsen are Miller's agents for purposes of this release. *See, e.g.*, *Agency of Nat. Res. v. Towns*, 724 A.2d 1022, 1024 (Vt. 1998) ("the relationship between attorney and client is that of agent and principal"); *Berkshire Bank v. Kelly*, 2023 Vt. 2, 2023 WL 188386, at *5 (Vt. Jan. 13, 2023) ("it is clear that defendant's counsel was acting as defendant's agent, consistent with the usual attorney-client relationship").

Jenkins's own complaint allegations demonstrate she considered Liberty Counsel and Lindevaldsen to be Miller's agents as her legal counsel. For example, Jenkins explicitly alleges that Liberty Counsel and Lindevaldsen acted "on behalf of Lisa Miller." (RSAC, ¶ 26; *see also* RSAC, ¶¶ 21, 31, 40, 46, 57, 61; Facts pt. II.A, *supra*.) The district court so acknowledged in its orders. *See, e.g.*, *Jenkins v. Miller*, No. 2:12-cv-184, 2017 WL 1052582, at *9 (D. Vt. Mar. 20, 2017) (noting Jenkins's assertion that Petitioners were "Miller's lead attorneys"); *Jenkins v. Miller*, 983 F. Supp. 2d 423, 446–47 (D. Vt. 2013) (discussing Petitioners' "representing" Miller in the Vermont litigation). (*See also* Ex. 1, dkt. 731, at 3 ("There is no dispute that Liberty Counsel and Lindevaldsen allegedly served as Lisa Miller's counsel."); Facts pt. II.B, *supra*.) Moreover, the Settlement Agreement itself, which contains the

14

release of Miller and her agents, identifies Liberty Counsel and Lindevaldsen as Miller's legal agents: "Lisa Miller ('Miller') voluntarily offers a limited waiver of her attorney-client privilege, and agrees not to assert her attorney-client privilege, in relation to the representation of her by Liberty Counsel or Rena M. Lindevaldsen . . . ." (Ex. 2, dkt. 718-1, Settlement Agreement, Exhibit B, at 1, ¶ 1; *see* Facts pt. II.C, *supra*.)

Jenkins, having herself identified Liberty Counsel and Lindevaldsen as Miller's legal agents, executed the Settlement Agreement explicitly and unequivocally releasing all claims against Miller and her agents in this action. (Ex. 2, dkt. 718-1, Settlement Agreement 5–6, § 5.) This release moots the case as to Liberty Counsel and Lindevaldsen. Thus, the district court lacked subject-matter jurisdiction over Jenkins's claims against Liberty Counsel and Lindevaldsen and should have dismissed them. *See Long Island Lighting*, 888 F.2d at 233; Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Mandamus is appropriate to confine the district court to its constitutionally limited jurisdiction.

**B. Jenkins's Release of Miller's Agents Must Be Enforced Under Vermont Contract Law in Accordance with It's Plain, Unambiguous Terms.**

    **1. Settlement agreements and releases are governed by contract law and, where not ambiguous, must be enforced according to their plain meaning.**

"It is well established that settlement agreements are contracts and must therefore be construed according to general principles of contract law." *Collings v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (cleaned up); *see also Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005) (same). And "a trial court has inherent power to enforce summarily a settlement agreement when the terms of the agreement are clear and unambiguous." *Omega*, 432 F.3d at 444 (cleaned up). The same is true under Vermont law, which Jenkins and Miller chose to govern the Settlement Agreement. (Ex. 2, dkt. 718-1, Settlement Agreement 7, ¶ 7; *see* Facts pt. I.B, *supra*.) *See Rogers v. Rogers*, 373 A.2d 507, 509 (Vt. 1977) ("It is the well established rule of law in this State that [a settlement agreement] is a contract."); *see also Chester v. Weingarten*, No. 2012-313, 2013 WL 9055957, at *2 (Vt. Oct. 11, 2013) ("It is well established that settlement agreements are governed by contract law." (collecting cases)).

Like a settlement agreement, "a release is treated as a contract," *Leo v. Hillman*, 665 A.2d 572, 579 (Vt. 1995), and "the modern view of releases generally in Vermont [is] that a release is a contract and its scope is determined by the 'intention of the parties **as expressed in the terms of a particular instrument** and considered

16

in light of all facts and circumstances.'" *Id.* (emphasis added) (quoting *Economou v. Economou*, 399 A.2d 496, 500 (1979)). Indeed, "where the language of a release is clear, effect must be given to the intent of the parties as indicated by the language employed." *Tromp v. City of New York*, 465 F. App'x 50, 56 (2d Cir. 2012) (cleaned up). And "there is a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption." *Solis v. 666 Fifth Assoc. LLC*, No. 20 Civ. 5105 (AKH), 2021 WL 5998416, at *4 (S.D.N.Y. Dec. 20, 2021) (cleaned up); *Schecter v. Eagle, S.A. Funding Co.*, No. CV 90-0324 (ADS), 1990 WL 92712, at *6 (E.D.N.Y. June 26, 1990) (same).

## 2. A court may not consider extrinsic evidence to interpret a contract where the terms used by the parties are unambiguous.

In Vermont and elsewhere, "[b]efore extrinsic evidence may be used to aid in the construction of a written instrument, ambiguity must first be found." *Isbrandtsen v. North Branch Corp.*, 556 A.2d 81, 83 (Vt. 1988). And "[a] provision of a contract is ambiguous only to the extent that reasonable people could differ as to its interpretation." *Id.* "If, however, no ambiguity is found, then the language must be given effect in accordance with its plain, ordinary and popular sense." *Id.* at 85. In sum,

> if the language of the instrument is clear and unambiguous its intent cannot be altered by evidence of extraneous circumstances; and in such situation the instrument is to be interpreted by its own language, and

> **the understanding of the parties must be deemed to be that which their own written instrument declares**.

*Cross-Abbott Co. v. Howard's, Inc.*, 207 A.2d 134, 137 (Vt. 1965) (emphasis added).

Although Vermont does not allow resort to extrinsic evidence to construe an unambiguous provision of a contract, it does allow limited use of extrinsic evidence to determine whether an ambiguity exists. *See id.* at 84. Thus, "when inquiring into the existence of ambiguity," a court may "consider the circumstances surrounding **the making** of the agreement. Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are **reasonable**." *Id.* But since *Isbrandtsen*, the Vermont Supreme Court has clarified that a party seeking to be excused from the bargain she made cannot use extrinsic facts and circumstances to create ambiguity where none exists in the plain language of the agreement. *See, e.g.*, *Whitney v. Vermont Mutual Ins. Co.*, 135 A.3d 272, 277 (Vt. 2015) ("[W]e have held that the expectations of [a party] cannot control over the unambiguous language of the [contract]."); *Downtown Barre Dev. v. C&S Wholesale Grocers, Inc.*, 857 A.2d 263, 266 (Vt. 2004) ("While we may consider the circumstances surrounding the making of the agreement in determining whether its provisions are ambiguous, **those circumstances may not be used to vary the terms of an unambiguous writing**." (emphasis added)); *Kipp v. Estate of Chips*, 732 A.2d 127, 131 (Vt. 1999) (clarifying *Isbrandtsen*'s rule by holding that the facts and

18

circumstances "**may not be used to vary the terms of an unambiguous writing**" (emphasis added)).

Indeed, the Vermont Supreme Court has expressly cabined *Isbrandtsen*'s extrinsic evidence inquiry by explaining that "the parol evidence rule is still good law," and that "[t]he rule permitting contracts to be read in light of the surrounding circumstances should not be allowed . . . to swallow the parol evidence rule." *Tilley v. Green Mountain Power Corp.*, 587 A.2d 412, 414 (Vt. 1991); *see also Judge Dev. Corp. v. Bank of New York*, 814 F. Supp. 384, 388 (D. Vt. 1993) ("[T]he [*Isbrandtsen*] Court was quick to point out in a footnote that the parol evidence rule is still good law and that [extrinsic evidence] may not replace or modify a contemporaneous or subsequent written agreement."). Thus, where resort to extrinsic facts and circumstances of the making of an agreement do not reveal an ambiguity in an otherwise clear term, the extrinsic facts and circumstances warrant no further consideration, and the plain, ordinary meaning of the unambiguous provision controls. *See Scott v. State*, 256 A.3d 105, 112 (Vt. 2021).

As with other contracts or contract provisions, release terms are to be construed by their plain meaning alone in the absence of ambiguity. When determining the scope of a release of liability, this Court has interpreted Vermont law to allow resort to parol evidence only when the terms of the release are ambiguous. *See Okemo Mountain, Inc. v. U.S. Sporting Clays Ass'n*, 376 F.3d 102, 104 (2d Cir. 2004). There,

this Court explained, "Vermont law plainly requires that when 'the scope of the release cannot be determined from the language alone,' and the 'language of the document is ambiguous,'" construction of the contract is a question of fact on which external evidence is permissible. *Id.* (quoting *Inv. Props., Inc. v. Lyttle,* 739 A.2d 1222, 1229–1230 (1999)). Much like general contractual provisions, however, consideration of extrinsic or parol evidence is only permissible when ambiguity exists. *See Scott*, 256 A.3d at 110 ("When the language of a release is clear, we presume it reflects [the parties'] intent.").

### C. Jenkins's Release of Miller's Agents Must Be Enforced as Written Because the Term "Agents" Has a Plain and Ordinary Meaning and Is Not Ambiguous.

Jenkins's release of Miller and her agents in the Settlement Agreement is clear and unambiguous. The term "agents" (or "agent") has an ordinary meaning, and reasonable minds cannot differ as to its definition. The Restatement (Third) of Agency defines "agency" as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency

§ 1.01.[1] There is no question that the definition of "agent" includes the relationship of a lawyer to her client. *See id.* cmt. c ("The elements of common-law agency are present in the relationships between . . . client and lawyer."); *see also U.S. Dep't of Justice v. Hudson*, 626 F.3d 36, 39 (2d Cir. 2010) (explaining "an 'attorney' is . . . 'a legal agent'" (quoting *Black's Law Dictionary* 147 (9th ed. 2009)) and quoting opinion "cataloguing the definition of 'attorney' from more than two dozen dictionaries and finding that without exception they define the word 'attorney' in terms of someone who acts for *another,* someone who is employed as an agent to represent *another*, someone who acts at the appointment of *another"* (cleaned up) (quoting *Duncan v. Poythress*, 777 F.2d 1508, 1518–19 (11th Cir. 1985) (Roney, J., dissenting))). The Vermont Supreme Court has likewise observed that an attorney is unquestionably and primarily defined as "a legal agent." *Toensing v. Att'y Gen. of Vt.*, 212 A.3d 180, 183 (Vt. 2019).

Jenkins said she released Miller's agents in unambiguous language she "carefully read . . . fully understood, and . . . executed with full knowledge of its significance." (Ex. 2, dkt. 718-1, Settlement Agreement, at 7–8.) The plain and ordinary meaning of "agents" covers Liberty Counsel and Lindevaldsen in Jenkins's release. The

---

[1]    The Vermont Supreme Court follows the Restatement (Second) of Agency and the Restatement (Third) of Agency. *Payne*, 987 A.2d at 953 n.6. Both define agency in the same manner.

unambiguous term—which Jenkins carefully chose and understood—is presumed to reflect her intent as a matter of law. *See Scott*, 256 A.3d at 110; *see also Stevens v. Cross Abbott Co.*, 283 A.2d 249 (Vt. 1971) ("This paragraph expressed the intent of the parties in plain, clear and precise language which leaves no room for construction or interpretation. And where the language is clear, the intention and understanding of the parties must be taken to be that which their agreement declares." (cleaned up)).

Where a settling party has attempted to avoid the implications of the release of an agent, numerous federal and state courts across the country have held that the term was unambiguous. *See, e.g.*, *Kugler v. LexisNexis Occupational Health Solutions, Inc.*, 16 F. Supp. 3d 999, 1002–1003 (E.D. Wis. 2014) ("The fact that the term [agent] is broad does not make it ambiguous . . . ."); *Hernandez ex rel. Gonzalez v. Tapia*, No. 10-CV-4124, 2010 WL 5232942, at *5 (N.D. Ill. Dec. 15, 2010) (because the settlement agreement included a release of agents and employees, terms which are not ambiguous on their face, parol evidence of a contrary intention is not admissible); *Farmers Auto Ins. Ass'n v. Wroblewski*, 887 N.E.2d 916, 924 (Ill Ct. App. 2008) (because release of liability identified "agents" and "employees" and those terms are not ambiguous, release language must be enforced as written and agents released, and parol evidence of contrary intention not permissible); *Polsky v. BDO Seidman*, 688 N.E.2d 364, 371 (Ill. Ct. App. 1997) ("In this case, the release

unambiguously applied to Indeck's agents and persons who acted on Indeck's behalf. Defendants were members of these classes. Therefore, we may not consider parol evidence to determine plaintiff's intent with respect to whether the release encompassed defendants."); *Atlas One Fin. Grp., LLC v. Alarcon*, No. 12-23400-Civ., 2015 WL 1191211, at *4 (S.D. Fla. 2015) ("Contrary to the Alarcon Group's contentions, the use of the word 'agent' in the Release does not create an ambiguity which requires me to turn to extrinsic evidence. Rather, the word 'agent' has a plain and ordinary meaning . . . ." (cleaned up)); *Horizon Fin., F.A. v. Hansen*, 791 F. Supp. 1561, 1573 (N.D. Ga. 1992) (construing release language under Pennsylvania law: "'Agents' is not an ambiguous term. There are no grounds upon which the court may consider plaintiff's parol evidence."); *Alpine Fresh, Inc. v. Washburn*, 77 So.3d 765, 767 (Fla. 3d DCA 2011) (interpreting release language releasing "agents" and "representatives" according to its plain language"); *Bd. of Trustees of Florida Atl. Univ. v. Bowman,* 853 So.2d 507, 510 (Fla. 4th DCA 2003) ("The inclusion of agents, employees, etc. is simply standard language in a general release that should be considered unambiguous and should not invalidate the proposal."); *Genesis Software Sys., Inc. v. Ceridian Corp.*, No. 1:14-CV-2658-MHC, 2016 WL 4357513, at *4 (N.D. Ga. Jan. 25, 2016) (holding party to terms of settlement agreement because "[t]he term 'agents' in the Settlement Agreement's release provision is unambiguous"); *Brandow Chrysler Jeep Co. v. Datascan Tech.*, No. 06-5093, 2008

23

WL 4274494, at *3 n.3 (E.D. Penn. Sept. 17, 2008) (rejecting argument that term "agent" made release ambiguous and refusing admission of parol evidence).

In *Kugler*, a plaintiff who had settled her claims with defendants in a prior case, and released their agents, asserted she did not intend the release of a new defendant in a new case who claimed to be an agent of the settling defendants. 16 F. Supp. 3d at 1001. She wanted to introduce extrinsic evidence of her intent not to release the new defendant. *Id.* But the court rejected her argument that the term "agent" was ambiguous in the release:

> Here, when signing the agreement, no one knew how many agents [the settling defendant] might have, or what kind of agents they might be. What they did know (if they considered the question at all) was that [the settling defendant's] agents—in whatever capacity they served—would enjoy the benefits of the release. **The fact that the term is broad does not make it ambiguous** . . . . The question of whether one person is an agent of another is something that is frequently litigated because it can often be a fact-intensive inquiry. However, even if the question of *whether* someone is an agent is sometimes difficult, that does not mean that the term "agent" *itself* is ambiguous.

*Id.* at 1001–1003 (emphasis added).

In other matters where parties have attempted to avoid the consequences of unambiguous releases by claiming they were unintended, courts have held the parties to the plain meaning of the language they agreed to. For example, in *Anderson v. State*, 518 A.2d 360 (Vt. 1985), a party executed a full release of his damages claim in return for a settlement payment of $3,500.00. 518 A.2d at 361. Neither the settlement stipulation nor the release mentioned payment of attorney's fees, and the

24

settlement check—which the plaintiff cashed—bore the notation "in full and final settlement." *Id.* at 361–62. The plaintiff argued she intended to except attorney's fees from the release, but the trial court rejected her argument because it was in direct conflict with the plain language of the settlement and release documents. *Id.* at 362. The Vermont Supreme Court affirmed:

> We emphasize [the direct conflict found by the trial court] in lieu of other support present to sustain the result reached below because these findings deal with a document prepared by plaintiff's attorney. He faults the defendant's agent for not stating in the stipulation that attorney's fees were included in the settlement. **How hollow that rings in the face of the document the plaintiff's attorney prepared dealing with all of the issues encompassed in the settlement. If it was a bona fide term of the settlement that attorney's fees were reserved, what justification exists for not saying so in the release?**

*Id.* at 362 (emphasis added).

## D. The District Court's Rewriting of the Release's Unambiguous Terms Based on Extrinsic Evidence of the Parties' Purported Intent Was Legal Error and a Usurpation of Authority.

The district court stated the *Isbrandtsen* ambiguity rule correctly enough, but then wholly departed from it. (Ex. 1, dkt. 731, at 7 ("The Vermont Supreme Court has opined that it is 'appropriate, when inquiring into the existence of ambiguity, for a court to consider the circumstances surrounding the making of the agreement.'" (quoting *Isbrandtsen*, 556 A.2d at 84)).) But the court did not consider extrinsic circumstances to determine whether "agents" is ambiguous—indeed, the court never concluded that the term "agents" is ambiguous. Nor did the court consider extrinsic

circumstances "surrounding the making of the agreement." Rather, the district court considered statements made by Jenkins and Miller **after** the agreement was made, and relied on those statements to purportedly determine "the parties' intent." (Ex. 1, dkt. 731, at 7–8.) Thus, without ever inquiring or determining whether the term "agents" is ambiguous (it is not), the district court simply rewrote the release to "favor Jenkins' position" based on legally prohibited consideration of extrinsic evidence of the parties' purported "intent." This was a usurpation of judicial power.

The district court's further appeal to a reading of the Settlement Agreement "'in its entirety'" fails to correct its legal error. (Ex. 1, dkt. 731, at 8.) Petitioners agree that a court must read all of what the parties **said** to determine the meaning of what they **said** in a particular provision. But the question of ambiguity is only rightly directed to a specific provision of a contract, not the contract as a whole: "A **provision** in a contract is ambiguous only to the extent that reasonable people could differ as to its interpretation." *Isbrandtsen*, 556 A.2d at 83 (emphasis added). If "agents" does not mean Miller's agents, such as Petitioners, then whom does the term cover? Jenkins failed below to identify what alternative interpretations of "agents" are available to reasonable people, and the district court suggested none. The reason is simple: there are no other reasonable interpretations of the term. The district court simply decided, *ipse dixit*, that the term "agents" does not mean "agents," but instead means "some agents" and excludes Petitioners despite the

Settlement Agreement's not saying so. (Ex. 1, dkt. 731 at 7 ("the Court finds that the reference to 'agents' does not include movants").)

The Vermont Supreme Court's decision in *Scott* is particularly instructive. There, like here, a party who signed a release of his claims later became dissatisfied with the results of the release. 256 A.3d at 110 ("he contends that, read narrowly and in context, the release does not encompass the instant cause of action [and] suggests that the intent underlying the release is better understood with reference to extrinsic evidence of the circumstances surrounding its execution"). The plaintiff there, like Jenkins below, contended that the overall intent of the contract belied the claim that he had released all claims against the defendant. *Id.* at 111 ("Scott argues that future statutory of VIPA claims were not expressly mentioned in the release, and that this omission reflects an intent to exclude such actions to the universal claims he released."). But the court rejected that contention: "We first note that the general release's explicit reference to claims 'in law or in equity' belies Scott's assertion that it includes no reference to statutory claims. What remains, then, is his argument that the lack of any reference to the VIPA specifically should be construed to mean the parties did not intend to release claims arising thereunder. We do not agree." *Id.* at 111. "[T]he terms of the release Scott signed are not internally inconsistent or ambiguous. At no point does the language of the release suggest that it is limited . . . rather, its language uniformly releases all such claims." *Id.* at 111 (emphasis added).

"**[W]e reject Scott's suggestion that extrinsic evidence of the facts and circumstances surrounding the execution of the release is admissible for purposes of determining his intent**. . . . Because the document is unambiguous, the extrinsic evidence Scott cites is not appropriately subject to further consideration" *Id.* at 112 (emphasis added).

The same is true here. Jenkins intentionally executed a release of Miller and her agents. Whatever was going on in the minds of Jenkins and Miller when they made the Settlement Agreement—whatever their view of the past or expectations for the future—the term "agents" that they negotiated and agreed to is not ambiguous. "Agents" has a plain and ordinary meaning. That meaning is broad, to be sure, but not ambiguous. *See Kugler*, 16 F. Supp. 3d at 1002–1003. None of the extrinsic circumstances considered by the district court revealed the term "agents" to be ambiguous, and therefore they warrant no further consideration. *See Scott*, 256 A.3d at 112. The release is binding on Jenkins as written, and Petitioners' entitlement to mandamus relief is clear.

## II. PETITIONERS HAVE NO OTHER ADEQUATE MEANS TO OBTAIN THE RELIEF THE CONSTITUTION DEMANDS.

### A. Petitioners Have Exhausted All Other Available Alternatives.

Where, as here, Petitioners cannot obtain adequate relief by means of interlocutory appeal or under the collateral order doctrine, mandamus is the only alternative. *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 35–36

(2d Cir. 2014). Additionally, "an appeal after final judgment (albeit available) is not, under these circumstances, an 'adequate means' for [Petitioners] to obtain the relief [they] seek." *Id.* at 26. Petitioners have exhausted all means available, and mandamus is their only remaining alternative.

**B. Petitioners Would Suffer Irreparable Harm Absent Mandamus Relief.**

"In reviewing whether a petition meets the no-adequate-alternative requirement, we have examined whether issuing the writ would prevent an otherwise irreparable harm." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 107 (2d Cir. 2013). Post-judgment appeals are particularly unsuited to preventing irreparable harm, where, as here, fundamental constitutional protections would be forever lost absent mandamus relief. Indeed, "timing matters: 'Once the cat is out of the bag,' the right against disclosure cannot later be vindicated." *Roman Catholic Diocese*, 745 F.3d at 36 (quoting *S.E.C. v. Rajaratnam*, 622 F.3d 159, 170 (2d Cir. 2010)).

Petitioners' due process rights cannot later be vindicated. It is axiomatic that Petitioners cannot be forced to litigate in a district court lacking subject matter jurisdiction. *Fox v. Boucher*, 794 F.2d 34, 37 (2d Cir. 1986). Forcing Petitioners to litigate and submit to continued discovery in a forum without jurisdiction violates a basic principle of due process, and cannot be remedied through a regular appeal, after the right not to be subjected to litigation has already been infringed. Absent mandamus relief, Petitioners' due process rights not to be subjected to litigation over

29

moot claims will have been thrust out of the bag, never to be recaptured. Such a loss of constitutional rights "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## III. MANDAMUS RELIEF IS APPROPRIATE UNDER THE CIRCUMSTANCES.

This Court has noted that mandamus relief is appropriate where (1) "a district court ruling flagrantly misapplies a well-settled principle of law," *Linde v. Arab Bank, PLC*, 706 F.3d 92, 108 (2d Cir. 2013); *In re Roman Catholic Diocese*, 745 F.3d 30, 27 (2d Cir. 2014); *In re City of New York*, 607 F.3d 923, 940 n.17 (2d Cir. 2010); (2) the district court's determination concerning its jurisdiction "is patently erroneous," *Roman Catholic Diocese*, 745 F.3d at 37; (3) there are "particularly serious harms preventable only through the issuance of a writ of mandamus," *id.*; and (4) the petition includes "the presence of a legal issue whose resolution will aid in the administration of justice." *City of New York*, 607 F.3d at 939.

Here, there can be no doubt that mandamus is appropriate. The district court's decision was patently erroneous (*see* Reasons for Granting the Petition pt. I, *supra*) its determination represents a judicial usurpation of power by continuing to exercise jurisdiction over claims that have been mooted (*id.*), and it misapplied Supreme Court and Second Circuit precedent (*id.*)*.* Under such circumstances, "[t]he Supreme Court has recognized . . . the ability of mandamus to 'serve as a useful safety valve for promptly correcting serious errors' [and] particularly injurious rulings." *City of*

*New York*, 607 F.3d at 939 (quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)). The district court's order committed serious error and works a manifestly unjust injury on Petitioners. Moreover, mandamus in this situation is appropriate because it will aid in the administration of justice.

## CONCLUSION

Because Petitioners have a clear and indisputable right to relief, have exhausted all other available alternatives, and will suffer irreparable injury absent mandamus relief, the Petition should be granted.

Respectfully submitted,

/s/ Daniel J. Schmid
Horatio G. Mihet
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: dschmid@lc.org

*Attorneys for Petitioners Liberty Counsel, Inc. and Rena M. Lindevaldsen*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the word limit of Fed. R. App. P. 21(d)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 7,643 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared using Microsoft Word 2016 in 14-point Times New Roman.

/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Petitioners Liberty Counsel, Inc. and Rena M. Lindevaldsen*

# CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2023, I served true and correct copies of the foregoing Petition for Writ of Mandamus and accompanying exhibits via electronic filing in the United States District Court for the District of Vermont, in which the district court and all counsel of record below received electronic service:

**<u>Counsel for Plaintiff</u>**
Frank Langrock
LANGROCK SPERRY & WOOL, LLP
111 S. Pleasant Street
Middlebury, VT 05753
Email: flangrock@langraock.com
Phone: (802) 388-6356

**<u>District Court</u>**
Hon. Judge William K. Sessions, III
United States District Court of the District of Vermont
11 Elmwood Ave., Room 506
Burlington, VT 05401
Phone: (802) 951-6301

I also served true and correct copies of the foregoing petition on the same date, via electronic mail, upon all defendants in the district court action.

/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Petitioners Liberty Counsel, Inc.*
*and Rena M. Lindevaldsen*

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2023, I served true and correct copies of the

foregoing Petition for Writ of Mandamus and accompanying exhibits via Federal

Express, Postage Prepaid on the following counsel of record.:

**<u>Counsel for Plaintiff</u>**
Frank Langrock
Emily J. Joselson
LANGROCK SPERRY & WOOL, LLP
111 S. Pleasant Street
Middlebury, VT 05753
Email: flangrock@langraock.com
ejoselson@langrock.com
Phone: (802) 388-6356

Lina M. Bensman
Patrick C. Swiber
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
(212) 225-3999 (fax)
lbensman@cgsh.com
pswiber@cgsh.com

Sarah Star
SARAH STAR, PC
P.O. Box 106
Middlebury, Vermont 05753
(802) 385-1023
srs@sarahstarlaw.com

Scott D. McCoy
SOUTHERN POVERTY LAW CENTER
2 South Biscayne Boulevard, Suite 3750
Miami, Florida 33131
(334) 224-4309
(786) 237-2949 (fax)
scott.mccoy@splcenter.org

Aaron S. Fleisher*
SOUTHERN POVERTY LAW CENTER
1101 17th Street Northwest, Suite 705
Washington, DC 20036
(202) 536-9719
(202) 971-9205 (fax)
aaron.fleisher@splcenter.org
* *Not admitted to practice law in DC*

Diego A. Soto
Maya G. Rajaratnam
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
(334) 946-8200
(334) 946-8481 (fax)
diego.soto@splcenter.org
maya.rajaratnam@splcenter.org

Jessica L. Stone
SOUTHERN POVERTY LAW CENTER
150 East Ponce de Leon Avenue, Suite 340
Decatur, Georgia 30030
(404) 221-5837
(404) 221-5857 (fax)
jessica.stone@splcenter.org

**Counsel for Defendants**

Michael R. Hirsh
Hirsh Law Office, LLC
2295 Towne Lake Parkway, Suite 116-181
Woodstock, GA 30189
Phone: (678) 653-9907
Email: michael@hirsh.law
*Counsel for Defendants*
*Zodhiates, Hyden, and RUL, Inc.*

Michael J. Tierney
Wadleigh, Starr & Peters
95 Market Street
Manchester, NH 03101
Phone: (603) 669-4140
Fax: (603) 669-6018
Email: mtierney@wadleighlaw.com
*Counsel for Defendant Timothy D. Miller*

Robert J. Kaplan
Kaplan and Kaplan
Park Plaza, Suite 405
95 St. Paul Street
P.O. Box 405
Burlington, VT 05402-0405
Phone: (802) 651-0013
Fax: (802) 448-3478
Email: rkaplan@kaplanlawvt.com
*Counsel for Defendant Kenneth L. Miller*

**District Court**
Hon. Judge William K. Sessions, III
United States District Court of the District of Vermont
11 Elmwood Ave., Room 506
Burlington, VT 05401
Phone: (802) 951-6301

I also served true and correct copies of the foregoing petition via electronic filing in the United States District Court for the District of Vermont on August 24, 2023, in which the district court and all counsel of record below received electronic service via the Court's ECF/electronic notification system to which all Counsel of Record have consented to electronic service.

/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Petitioners Liberty Counsel, Inc. and Rena M. Lindevaldsen*

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JANET JENKINS, et al.,            )
                                  )
        Plaintiffs,               )
                                  )
    v.                            )   Case No. 2:12-cv-184
                                  )
KENNETH L. MILLER, et al.,        )
                                  )
        Defendants.               )

## OPINION AND ORDER

Defendants Liberty Counsel, Inc. and Rena M. Lindevaldsen ("movants") move the Court to dismiss the claims brought against them by Plaintiff Janet Jenkins. The motion is based on movants' reading of a settlement agreement between Jenkins and Defendant Lisa Miller, in which Jenkins agreed to release Miller and her "agents" from liability. Movants claim that, as Lisa Miller's former legal counsel, they were her "agents" and have therefore been released. Jenkins contends that despite the use of the term "agents," a reading of the entire settlement agreement makes clear that the parties only intended to release and dismiss Lisa Miller. For the reasons set forth below, the Court agrees with Jenkins and the motion to dismiss is denied.

## Factual Background

The facts of this case are well established, and the parties' familiarity with those facts is assumed. Briefly stated, Jenkins claims that several parties, including the

movants, assisted Miller in kidnapping Jenkins' daughter, Isabella Miller-Jenkins. The operative complaint alleges intentional kidnapping and a conspiracy to engage in civil rights violations. ECF No. 223.

On February 16, 2022, in a separate criminal case, Miller pleaded guilty to parental kidnapping and was subsequently sentenced to time served. On May 26, 2022, shortly after Miller's sentencing, Jenkins informed the Court that the parties would try to resolve this case by means of mediation. The initial mediation occurred on October 7, 2022. While no agreement was reached, negotiations continued between Jenkins and Miller. On or about March 21, 2023, Jenkins and Miller entered into a settlement agreement. On March 23, 2023, Jenkins filed a notice of dismissal, dismissing Miller from the case without prejudice. ECF No. 706. No other parties were dismissed at that time.

The parties' settlement agreement expressly states that it is "between and among Janet Jenkins ('Jenkins') and Lisa Miller ('Miller')." ECF No. 718 at 1. The agreement further states that the Parties "wish to finally settle, end and fully and forever resolve the Dispute and Lawsuit with respect to Jenkins's claims against Miller." *Id.* at 2. Miller's consideration for the settlement includes her agreement to provide a proffer of anticipated testimony, some of which

testimony will detail movants' involvement in the alleged conspiracy, and to appear voluntarily for a one-day deposition. *Id.* at 2-3. Jenkins agreed to dismiss Miller from this case and to assist in the resolution of other related legal matters.

The settlement agreement includes a mutual release with the following language:

> The Parties, on behalf of themselves, their successors, heirs, administrators, executors, or assigns, hereby release and discharge the other Party, *to include the other Party's agents*, and assignees, from all known and unknown ... claims, ... which either Party has, or may have had, against the other Party ... to include, but not limited to, all claims in any way related to the Lawsuit.

ECF No. 718 at 6 (emphasis supplied). The settlement agreement provides that it is to be enforced according to Vermont law, and that "[a]ll prior representations, commitments, and understandings between the Parties regarding the subject matter of this Agreement are merged into and replaced by this Agreement." *Id.* at 7.

Movants argue that as Miller's former attorneys, they were her "agents" and were therefore released by the settlement agreement. There is no dispute that Liberty Counsel and Lindevaldsen allegedly served as Lisa Miller's counsel. Jenkins argues that the settlement agreement, viewed in the context of the entire document and, if necessary, relevant extrinsic

evidence, compels the conclusion that the only party released
was Lisa Miller.

## Discussion

Movants submit their motion under Federal Rules of Civil
Procedure 12(b)(1) and 12(h)(3), claiming lack of subject matter
jurisdiction.  In resolving motions to dismiss under Rule
12(b)(1), the Court must take all uncontroverted facts in the
complaint as true and draw all inferences in favor of the party
asserting jurisdiction.  *Tandon v. Captain's Cove Marina of
Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  "But where
jurisdictional facts are placed in dispute, the court has the
power and obligation to decide issues of fact by reference to
evidence outside the pleadings."  *Id.* (citation omitted)
(cleaned up).  If subject matter jurisdiction is lacking, a
court cannot proceed further.  *See* Fed. R. Civ. P. 12(h)(3) ("If
the court determines at any time that it lacks subject-matter
jurisdiction, the court must dismiss the action.").

Here, movants rely exclusively upon the settlement
agreement, which is outside the pleadings.  That agreement is
governed by Vermont contract law.  *See Rogers v. Rogers*, 135 Vt.
111, 112 (1977).  The question presented is whether, under
Vermont law, movants are entitled to dismissal based upon the
word "agents" in the settlement agreement's mutual release.

4

The Court "interprets the unambiguous terms of [a settlement agreement] as a matter of law." *Bonanno v. Verizon Bus. Network Sys.*, 2014 VT 24, ¶ 13. "The cardinal principle in the construction of any contract is to give effect to the true intention of the parties." *In re Cronan*, 151 Vt. 576, 579 (1989). "In order to effectuate the intentions of the parties, the literal terms of the contract cannot always be taken in isolation." *Bonanno*, 2014 VT 24, ¶ 13. Instead, "the contract provisions must be viewed in their entirety and read together." *In re Stacey*, 138 Vt. 68, 72 (1980). These pronouncements by the Vermont Supreme Court make clear that the term "agents" is not to be read in isolation. Instead, this Court must discern the intent of the parties in the context of the entire document.

A plain reading of the settlement agreement reveals a contract between two parties: Jenkins and Miller. Consideration is offered by each party in the form of agreements to undertake various acts. The agreement expressly addresses dismissal from the lawsuit, naming Lisa Miller as the only party to be dismissed. Other indications of the parties' intent include the introductory statement describing the agreement "as entered into between and among Janet Jenkins ('Jenkins') and Lisa Miller ('Miller')," a listing of each party's specific "obligations," and a signature page with Jenkins and Miller confirming "the acknowledgement of the parties."

5

Movants nonetheless urge the Court to focus on the word "agents" and order their dismissal from the case. For support, they cite Vermont case law for the proposition that the parties' intent is reflected in the clear language of the contract. *See, e.g., N. Sec. Ins. Co. v. Mitec Elec., Ltd.*, 2008 VT 96, ¶ 28 ("We presume that the parties' intent is reflected in the plain language of the release when that language is clear."); *In re Adelphia Bus. Solutions of Vt., Inc.*, 2004 VT 82, ¶ 7 ("*Adelphia*") ("[W]e interpret contracts to give effect to the parties' intent, which we presume is reflected in the contract's language when that language is clear."). In *Northern Security Insurance Company*, the Vermont Supreme Court noted that "[a]s with any contract, our task ... is to ascertain the intent of the parties at the time of execution." 2008 VT 96, ¶ 20. In *Adelphia*, the Vermont Supreme Court cited *In re Grievance of Verderber*, 173 Vt. 612, 615 (2002) (mem.), which held that "when the language of the contract is clear on its face, we will assume that the intent of the parties is embedded in its terms." *Verderber* followed that statement with the maxim that "[w]e must, however, give effect to every part of the instrument and form a harmonious whole from the parts." *Id.*

The briefing raises the question of whether, either in isolation or in the context of the entire agreement, the term "agents" is ambiguous. Movants urge the Court to find the term

6

clear and unambiguous and to look no further. The Vermont Supreme Court has opined that it is "appropriate, when inquiring into the existence of ambiguity, for a court to consider the circumstances surrounding the making of the agreement." *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579 (1988). Here, when considering such circumstances, the Court finds that the reference to "agents" does not include movants, and that the "writing in and of itself" does not "support[] a different interpretation from that which appears when it is read in light of the surrounding circumstances." *Id.; see also id.* at 580-81 ("If a contract, though inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous or fatally unclear." *Allstate Ins. Co. v. Goldwater*, 163 Mich. App. 646, 648, 415 N.W.2d 2, 4 (1987)."); *Kipp v. Est. of Chips*, 169 Vt. 102, 107 (1999) ("If the court does not find the writing ambiguous, it must declare the proper interpretation as a matter of law.").

Moreover, any consideration of extrinsic evidence would favor Jenkins' position. Prior to the settlement, the parties informed the Court that they would be engaging in mediation. In March 2023, Jenkins notified the Court that she had settled with Miller, and that "[n]o settlement negotiations with other defendants are currently ongoing." ECF No. 705 at 2. Miller correspondingly informed the Court that she and Jenkins had

settled their dispute.  ECF No. 709 at 1.  In responding to movants' objection to Miller's dismissal from the case, Miller further stated that "[i]f Jenkin[s'] claims against [movants] are proven true, [movants] would be independently liable to Jenkins based on their alleged conspiring to deprive Jenkins of her civil rights."  *Id.* at 2.  Such statements make clear the parties' intent that movants remain defendants in this case.

Under Vermont law, this Court is to read the settlement agreement "in its entirety, so that the parts form a harmonious whole."  *In re West*, 165 Vt. 445, 450 (1996).  "In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that [the parties'] intention is to be determined by a consideration of what was within the contemplation of the parties when the release was executed, which in turn is to be resolved in the light of the surrounding facts and circumstances under which the parties acted."  *Economou v. Economou*, 399 A.2d 496, 500 (Vt. 1979).  Here, a full and fair reading of the settlement agreement makes clear that the release set forth therein pertained to Lisa Miller, and not to the co-defendant movants. The motion to dismiss is therefore denied.

## Conclusion

For the reasons set forth above, the motion to dismiss Liberty Counsel, Inc. and Rena M. Lindevaldsen (ECF No. 718) is

denied.  Movants' motion to stay proceedings pending resolution of their motion to dismiss (ECF No. 720) is denied as moot.

DATED at Burlington, in the District of Vermont, this 16th day of August, 2023.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge

## <u>CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE</u>

THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE (this "**Agreement**") is entered into between and among Janet Jenkins ("**Jenkins**") and Lisa Miller ("**Miller**"). Jenkins and Miller are sometimes hereafter referred to collectively as the "Parties" or individually as a "Party."

**WHEREAS,** Jenkins and Miller entered into a civil union in the State of Vermont in December 2000, and Miller conceived and delivered a child, Isabella, in April 2002 during the civil union;

**WHEREAS,** after the Parties separated, Miller filed a complaint to dissolve the civil union in November 2003, and in June 2004, Miller was awarded temporary legal and physical responsibility for Isabella, and Jenkins was awarded temporary parent–child contact with Isabella;

**WHEREAS,** the Parties were involved in a prolonged child visitation and custody dispute (the "**Dispute**") involving courts in Rutland Family Court, Vermont, the Juvenile and Domestic Relations District Court of Frederick County, Virginia, and the Bedford Juvenile & Domestic Relations District Court of Virginia, which resulted in various orders of contempt and sanctions against Miller;

**WHEREAS,** Jenkins sought a Modification of Parental Rights and Responsibilities of Isabella in May 2009;

**WHEREAS,** Miller left the jurisdiction of the United States with Isabella on or about September 21, 2009;

**WHEREAS,** the Rutland Family Court, Vermont, issued an order transferring sole physical and legal custody of Isabella to Jenkins on November 20, 2009;

---

**SETTLEMENT AGREEMENT** 1

**WHEREAS,** Jenkins filed a civil action, *Jenkins et al. v. Miller et al.*, No. 2:12-cv-00184-wks (D. Vt.), on August 14, 2012, (the "**Lawsuit**") alleging, without limitation, that Miller and other defendants kidnapped and conspired to kidnap Isabella to thwart the visitation and custody orders of the State of Vermont and the Commonwealth of Virginia, and to obstruct the parent–child relationship between Isabella and Jenkins;

**WHEREAS,** Isabella reached the age of majority in April 2020, which mooted the court orders for parental visitation;

**WHEREAS,** Miller returned to the jurisdiction of the United States in January 2021 and was served with the Lawsuit;

**WHEREAS,** the Parties to this Agreement wish to avoid incurring further costs associated with the Dispute and Lawsuit, and wish to finally settle, end and fully and forever resolve the Dispute and Lawsuit with respect to Jenkins's claims against Miller;

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, and agreements set forth in this Agreement, and other good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged and do support each covenant herein, the Parties hereby agree as follows:

1.  **Proffer**. As material consideration for this Agreement, Miller has tendered a proffer of the testimony that she will provide in connection with the Lawsuit. Jenkins has reviewed the proffer and sought follow-up with specific questions. A confidential statement of the proffer is attached as Exhibit A. Miller hereby represents that the facts and information contained in Exhibit A are true and correct to the best of her knowledge. The statement in Exhibit A is confidential and is entirely inadmissible for any purpose in the Lawsuit, including for impeachment purposes or any other reason. Jenkins, to include her attorneys, agrees to not

disclose, distribute or publish Exhibit A, in whole or in part, other than to her attorneys and to defendants and their attorneys in the Lawsuit, except as set forth in Paragraph 3.a, or if otherwise ordered by a court to do so. Prior to producing Exhibit A to defendants and their attorneys in the Lawsuit, Jenkins agrees to move the Court in the Lawsuit for a protective order that would designate Exhibit A as "confidential," not to be used or published outside of the Lawsuit.

2. **No Admission of Liability.** Each of the Parties to this Agreement agrees that the claims released by this Agreement are disputed and that this Agreement is made to avoid the cost of litigation regarding the Dispute and the Lawsuit, and that this Agreement shall not be construed as an admission of liability by any Party of any matter relating to the Dispute or the Lawsuit.

3. **Miller's Obligations:**

a. **Deposition Testimony**. Miller will appear voluntarily for deposition testimony subject to the conditions in this Agreement. The deposition will occur in a single day, not to exceed seven (7) hours of examination by counsel for Jenkins and subject to reasonable cross-examination by the other parties to the Lawsuit. The deposition will be conducted in Raleigh, NC or another reasonable location to be selected by Miller in Virginia or North Carolina. At the deposition, Miller will read into the record the statement in Exhibit A. The Parties agree that the obligations set forth in this paragraph are material terms of this Agreement.

b. **Limited Waiver of Attorney-Client Privilege**. Miller agrees to a limited waiver of the attorney-client privilege as set forth in Exhibit B (the "Waiver"), and Jenkins agrees that the waiver is limited as set forth therein.

c. **Discovery**. Without waiving any objections Miller may have, Counsel for

Miller agrees to accept service of a discovery subpoena from Jenkins in the Lawsuit.

4.    **Jenkins' Obligations:**

     a.    **Cooperation to Set Aside Orders**. Jenkins agrees to provide reasonable cooperation to Miller to set aside the following contempt orders and bench warrant, to include expressly consenting in writing by executing herewith the motions attached as Exhibits C and D, and take such other actions as reasonably necessary and requested by Miller to set aside such orders and warrant, to include the following:

         i.    Order, Virginia: In the Juvenile Court and Domestic Relations District Court of Frederick County, JA013947-03F, August 28, 2009. Jurisdiction transferred to Bedford Juvenile & Domestic Relations District Court of Virginia, JJ019920-01-00.

         ii.    Order, Rutland Family Court, Vermont, F453-11-03Rddm, January 29, 2010 and Arrest Warrant for Failure to Appear for Motion Hearing, Rutland Family Court, February 23, 2010.

     b.    **Testimony of Isabella**. Jenkins agrees that she will not subpoena Isabella to testify in the Lawsuit.

     c.    **Disclosure of and Claims Against Protected Parties**. Should Jenkins serve a discovery subpoena on Miller in the Lawsuit, or otherwise engage in discovery from Miller, to include any written or testimonial form of discovery, Jenkins agrees that Miller need not disclose to Jenkins the identity of any individual that qualifies as any of the following: (i) clergy and their immediate family, (ii) immediate family members of named defendants in the Lawsuit, (iii) individuals who provided housing during Miller's departure from the United States, all such individuals referred to collectively herein as

---

**SETTLEMENT AGREEMENT**               **4**

"**Protected Parties**." This protection against disclosure extends to the disclosure of personally identifiable facts of such individuals, e.g. street addresses where resided. Jenkins further promises and agrees that she will not bring any legal claims against Protected Parties for any cause of action in any way relating to the claims in the Lawsuit. Jenkins retains the right to pursue a claim against a Protected Party for any cause of action unrelated to the claims in the Lawsuit and in order to facilitate the collection of any judgment in the Lawsuit. Miller agrees that all current and former named defendants in the Lawsuit are excluded from the Protected Parties.

      d.    **Dismissal of the Lawsuit**. Within three (3) business days of finalization of this Agreement, Jenkins shall move to dismiss her claims without prejudice against Miller in the Lawsuit, with each party to bear their own respective costs and fees, by filing the attached motion to dismiss attached hereto at Exhibit E and taking such further action as reasonably necessary to obtain the dismissal. Within three business days of Miller appearing for a discovery deposition in the Lawsuit and testifying, Jenkins shall take any and all action necessary to convert the dismissal without prejudice into a dismissal with prejudice. Jenkins will make best efforts to complete Miller's deposition by July 31, 2023.

     5.    **Mutual Release**. The Parties, on behalf of themselves, their successors, heirs, administrators, executors, or assigns, hereby release and discharge the other Party, to include the other Party's agents and assignees, from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, medical costs, pain and suffering, mental anguish, emotional distress, expenses (including attorneys' fees and costs

FINAL – FOR EXECUTION

actually incurred), and punitive damages, of any nature whatsoever, known or unknown, which either Party has, or may have had, against the other Party, whether or not apparent or yet to be discovered, to include, but not limited to, all claims in or in any way related to the Lawsuit. This Agreement resolves any claim for relief that is, or could have been alleged, no matter how characterized, including, without limitation, compensatory damages, damages for breach of contract, bad faith damages, reliance damages, liquidated damages, damages for humiliation and embarrassment, punitive damages, costs, and attorneys' fees related to or arising from the Lawsuit. Notwithstanding any language to the contrary, this release does not release any claims related to the Parties' rights and obligations under this Agreement.

6.      **<u>Breach and Remedies</u>**.  The Parties acknowledge and agree that damages alone would not provide an adequate remedy for any breach of the terms of this Agreement and therefore that, without prejudice to any and all other rights and remedies available to any Party (including, but not limited to, damages), each Party shall be entitled, without proof of special damage, to the remedy of specific performance for any threatened or actual breach of such terms. The Parties further agree that in the event that either Party breaches the obligations set forth in this Agreement in any material respect, the non-breaching Party shall cease to be obliged to fulfill its obligations hereunder, without prejudice to any other remedies the non-breaching Party may have.

---

7.     **Governing Law and Jurisdiction**.  This Agreement shall be subject to, and construed in accordance with, the laws of the State of Vermont. The Parties agree that any dispute or action relating to this Agreement shall be litigated in the United States District Court for the District of Vermont, and the Parties hereby irrevocably submit to the jurisdiction thereof with respect to the interpretation and enforcement of this Agreement.

8.     **Representations and Warranties**. The Parties represent and warrant that they are fully authorized and empowered to execute this Agreement and to validly deliver the releases and other agreements contained herein. The Parties acknowledge that each party is relying upon these representations and warranties in entering into this Agreement.

9.     **Entire Agreement**. This Agreement is intended to be a complete compromise and settlement of claims that are the subject of genuine, bona fide disputes among the Parties. All prior representations, commitments, and understandings between the Parties regarding the subject matter of this Agreement are merged into and replaced by this Agreement. The Parties understand that this settlement is a compromise of disputed claims and defenses, and that the performance of the Parties under this Agreement is not to be construed as an admission of liability of any kind or any character on the part of any party, by which any liability or obligation is expressly denied. This Agreement, and the covenants and promises contained herein, are made by the Parties only to compromise and settle their disputes, to avoid the uncertainty and expense of litigation, and to buy peace.

10.     **Amendments.** This Agreement may not be supplemented, amended, or modified in any matter whatsoever except by written instrument signed by each Party, and stating their intention to modify or supersede this Agreement.

11.     **Reliance on Own Counsel**. The Parties each warrant and covenant that this

Agreement has been carefully read by each of them, is fully understood, and has been executed with full knowledge of its significance. The Parties acknowledge that each has made a full and complete investigation of the circumstances surrounding this matter. The Parties also acknowledge that they have been represented by independent legal counsel in this dispute and in the negotiation of the terms of this Agreement, that they have had an adequate amount of time to consider whether to sign this Agreement, and that they do so on the basis of independent legal advice and of their own free will, without duress or coercion of any kind, and that neither of them have relied upon any statement made orally or in writing by any other Party or by any attorney of any other Party, and that the statements, representations, warranties, and agreements made in this Agreement reflect and constitute the entire agreement of the Parties as to the matters addressed in this Agreement.

12.      **Drafting and Construction of Agreement**. This Agreement is the product of negotiations between the Parties and shall not be construed strictly against any Party. No remedy or election provided in this Agreement shall be deemed exclusive unless so indicated, but each shall, where possible, be cumulative of all remedies in law or equity. Except as otherwise specifically provided herein, each provision of this Agreement shall be deemed both a covenant and a condition. The Parties further agree that the normal rule of construction that any ambiguities in an agreement are to be resolved against the drafting Party shall not apply to the interpretation of this Agreement.

13.      **Severance.** The provisions of this Agreement are contractual, and not a mere recital, and shall be considered severable, so that if any provision or part of this Agreement shall at any time be held invalid, illegal, or unenforceable, that provision or a part thereof shall remain in force and effect to the extent allowed by law, and all other provisions of this Agreement shall remain in full force and effect, and enforceable.

14.     **Counterparts.** This Agreement may be executed in counterparts, each of which will be deemed an original and such counterparts together constituting a single, enforceable agreement. For purposes of this Agreement, a facsimile, PDF, digital, or email copy of a Party's signature shall be deemed an original and sufficient to bind such Party.

15.     **Additional Documents.** The Parties agree to reasonably cooperate and execute any and all supplementary documents and to take all additional actions which may be necessary or appropriate to give full force and effect to the foregoing terms of this Agreement.

16.     **Cost and Fees**. Each party agrees that if litigation is commenced to enforce any part of this Agreement, the prevailing Party or Parties shall be entitled to recover its reasonable attorneys' fees, court costs, and other reasonable expenses incurred in the enforcement of the rights and obligations contained herein through final order, which enforcement may be by way of suit for damages or injunctive or similar relief.

17.     **Confidentiality**. The terms of this Agreement shall remain CONFIDENTIAL and shall not be disclosed to any third party, except the parties to the Lawsuit and their attorneys, the Parties' counsel, accountants, financial advisors, and tax professionals retained by them, any federal, state, or local governmental taxing or regulatory authority and except as required by law or order of court, provided however, that the Exhibits B through E to this Agreement are not confidential (but Exhibit A is and shall remain confidential, as set forth in Paragraph 1). Nothing contained in this paragraph shall prevent any Party from stating that the Parties have "resolved all differences." If any subpoena, order, or discovery request from a proceeding other than in Lawsuit (the "**Document Request**") is received by any of the Parties hereto calling for the production of the Agreement, such Party shall promptly notify the other Party hereto prior to any disclosure of same and the Party receiving the request will allow the other Party at least ten (10)

---

**SETTLEMENT AGREEMENT**                                                                                   **9**

business days within which to respond to the request and will thereafter take reasonable steps to protect the confidentiality of this Agreement.

18. **Successors and Assigns.** The Parties agree that the terms, covenants, and obligations set forth herein shall inure to the benefit of and be binding upon each of their respective administrators, executors, successors, and assigns.

IN WITNESS WHEREOF, the undersigned have executed this Agreement to be Effective on the date of the last acknowledgment of the parties as shown below ("Effective Date").

By: _____
Janet Jenkins

Date: 3/20/2023

By: _____
Lisa Miller

Date: 3/21/23

**CONFIDENTIAL PROFFER**

**Exhibit A**

2007

Because people saw how much Isabella had changed since I began to allow visits again, many began to tell me to leave Virginia and make a new life for Isabella.

I had numerous offers to leave the state and the country. None of these were made by my attorneys.

I refused all the offers telling them that I did not feel God's blessing on leaving.

I did, however, keep a suitcase of clothes and Isabella's books and activities in my car just in case there was an emergency with Janet.


2008

As Isabella's behaviors became more severe a pastor began telling me that I should keep her home from school both the day before and the day after Isabella's visits with Janet because Isabella would just sit in her seat at school and do nothing except stare off in space. Furthermore, people continued to implore me to remove Isabella from being anywhere near Janet.

I had numerous offers to leave the state and the country. None of these were made by my attorneys.

I refused all the offers telling them that I did not feel God's blessing on leaving.

At this point in time, I felt God telling me to unpack my suitcase and to trust Him. I felt that He said that He was going to provide for me- even my clothing -if He wanted me to leave.


2009

I began praying and fasting over what I should do.

On day one of my fast I was approached at the church as I was going into the auditorium. I was handed a slip of paper by a PROTECTED PARTY with a phone number and name. The person handing it to me remarked that "We don't like that you don't have a plan B". Everyone knew my motto- "Standing for the Lord" and knew that I felt that if I "ran" then how could I "stand for the Lord". In other words, I didn't have any other plan than to stay in Virginia and see the case through to the end.

I was a little taken aback by the situation of being handed a slip of paper because my church at the time, Thomas Road Baptist Church, had about 3,000 people coming and going at any given time on a Sunday morning. I wondered how that person had found me, especially as I was going into an auditorium which I believe has 6 doors.

1

**CONFIDENTIAL PROFFER**

I held on to the number for at least a day, if not two. After school or at least on a break I did call that number. It turned out to be Philip Zodhiates and he wanted to help me leave. I was floored. He told me to think about it and asked to meet me. I thought that would be o.k. I did not bring Isabella.

During that visit he told me that I needed to leave in order to protect Isabella from further sexual abuse and that he might have an idea of how to protect her. Upon leaving that visit, he asked me to call him. However, I was so shocked that I did not.

He, however, called me near the end of my fast (he did not know I was fasting) and asked if I would meet him again. I said I would, and he set the date. That date was the last day of my fast! Again, I took this as the Lord saying leaving with Isabella might be a possibility.

Consequently, I went to his home and ate a meal with him. I did not bring Isabella with me. We talked about my leaving, and he told me that there were places I could go where Isabella would be kept safe until she was 18 and no longer under the auspices of being placed in the care of someone who was abusing her. I listened but didn't commit. Upon leaving that visit, he asked me to call him. Again, I did not.

Toward the end of the summer, Philip called me. He asked to meet again and to bring Isabella this time. I complied. We meet with Philip, Ken Miller and PROTECTED WITNESSES and it was decided that Isabella and I would leave Virginia so that she would be safe from further harm.

However, again, I was not convinced. People though began telling me to leave with Isabella in order to keep her safe from further harm.

After the meeting with these individuals, Rena Lindevaldsen asked for a meeting regarding my upcoming appeals. I met with her at her office where we discussed the ins and out of my case and on a more personal basis our upcoming plans for the upcoming school year. She then changed topics and said something like "I am going to take my lawyer hat off now and put on my friend hat". She began asking me about leaving, telling me that if Isabella was her child then she would leave. I don't remember exactly what I said but I did tell her that I was thinking of leaving and was just waiting to see if God opened the door again. She pressed the issue, and I told her that I was leaving if plans would solidify but that no date was set and I still wasn't convinced it was what God wanted. When our meeting ended we walked out to the hallway and as she hugged me she asked me if I was going to pay Phil Griffin before I left. (long story- he was suing me). She also asked me to draw up a form stating how much debt I had and who I owed it to and to get it to her by sending it through someone who would be attending a function she was going to attend later that summer. I said I would.

She told me not to worry about money while I was gone because she was going to write a book about my case and that would bring in money to support Isabella and me. I laughed and said my goodbyes.

2

**CONFIDENTIAL PROFFER**

Regarding the book: we did discuss the book earlier on and she did ask me several personal questions which I did respond to in various emails. My understanding of the book was that it was going to be about my case- not about me, per se.

My teaching contract had not been renewed which was the first time ever I had not been awarded a second contract to an employment position. I took it as God's leading that I was to homeschool Isabella which added credence to the possibility of leaving in order to protect Isabella.

About three weeks into the school year, I received a phone call from Philip Zodhiates; he asked me to meet him at Walmart. I thought it was going to be a meeting regarding my car trouble. I told him I was at church at the designated meeting time, but he said to come anyway. I left Isabella at church under the care of a friend whom I told I would return before church was out. Isabella was in class, and I was in the auditorium listening to a debate. My friend didn't ask me where I was going, and I didn't tell her.

I arrived at Walmart, and was told that we needed to return to church to get Isabella; tonight was the night we were leaving. I left my car at Walmart and returned with him to church where I picked up Isabella. We went straight to a safe place where I waited another day before tickets were procured for leaving the country.

While I was in the safe house I was told by Zodhiates that I was going to stay in the country but that Rena had said that I had to leave the country. Nicaragua was chosen.

The day we left we drove to an airport in New York where I was dropped off in order to take a taxi across the border of Canada.

I was given names and numbers of the place I was to stay and work while I was living abroad.


Nicaragua 2009-2011

Once I arrived in Nicaragua, I was told that plans had changed. I was no longer going to live and work at the place I had been told about.

I was instead taken to a PROTECTED WITNESSES's home and then sometime later I moved to Managua where I began working for Timo Miller, teaching his children alongside Isabella. I lived on my own and furthermore, was using my own money that I had brought with me.

During the time I was teaching in Managua, I was asked by Timo Miller what I wanted out of my duplex in Virginia. I was instructed to make a list of both the items I wanted and where the items could be found. I wrote the list and gave it to him. I also wrote a note to Rena. The note was a compilation of Bible verses which when put together read like a letter. I gave that to Timo Miller as well. Later I was told that Rena had received that letter and knew it was from me.

3

**CONFIDENTIAL PROFFER**

After the school term ended, I returned to the town where I had originally resided upon entering Nicaragua.  Once again, I lived on my own with Isabella, of course, and resumed teaching- again bringing Isabella with me.

I still had most of the money I brought with me.  One can live inexpensively in Nicaragua. Upon my calculation I had enough money to live for 3 years or more- depending if I earned additional income while in Nicaragua.

Follow up Questions:

1. 2009 timeline – approximate dates of meetings

I am not certain on the dates. I believe the first meeting was sometime in May- at least it was before Mother's Day of that year.  The last meeting was sometime in the summer – after school let out and 30 days after I started my fast.  We met again one more time before the final meeting which was in September- the 20th I think was when he picked me up. It was a Sunday though. And I left on September 21 I think and arrived in Nicaragua the 22nd.

My "taking off my lawyer hat" conversation with Rena was at the beginning of the school year, likely sometime in August 2009.

2. Conversation at safe house in 2009, who told you Rena said you had to leave the country and not stay in the USA?

I believe it was Phillip Zodhiates.

3. Who told me that Rena received the first letter?

I believe it was Ken Miller.

4. List of debts that Rena asked you to draw up and send it through "someone who would be attending a function she was going to attend later that summer." Do you recall who that "someone" was?

I believe it was Phillip Zodhiates.

4

**CONFIDENTIAL PROFFER**

5. Any more convo with legal team re leaving

I had no other conversations with my legal team regarding my departure or after I departed, and I am not aware of any other knowledge or involvement regarding my departure, other than my proffer statement about Rena.

6. Did Rena or anyone else see my journals prior to my departure

A huge NO. I shared my journals with no one.

**SETTLEMENT EXHIBIT B**

## LIMITED ATTORNEY-CLIENT PRIVILEGE WAIVER

Lisa Miller hereby voluntarily submits this limited waiver of her attorney-client privilege:

1.   Lisa Miller ("Miller") voluntarily offers a limited waiver of her attorney-client privilege, and agrees not to assert her attorney-client privilege, in relation to the representation of her by Liberty Counsel or Rena M. Lindevaldsen ("Lindevaldsen"), Liberty Counsel's or Lindevaldsen's agents or employees, and any counsels' agents or employees financed or directed by Liberty Counsel or Lindevaldsen regarding: (1) communications in or after 2009; (2) communications regarding whether Miller should, must, or would comply with then-existing or future court orders over the custody or visitation of Isabella Miller ("Isabella"); and (3) Miller's plan to depart the United States with Isabella, her actual departure and her remaining outside the jurisdiction of the United States. (the "Limited Waiver"). Miller agrees to not attempt to "claw back"  in the lawsuit, *Jenkins v. Miller et al.*, No. 2:12-cv-00184-wks (D. Vt.) (the "Lawsuit"), any documents produced in discovery prior to January 1, 2023 that might reflect privileged communications.

2.   This Limited Waiver is submitted as part of a Settlement Agreement between Janet Jenkins ("Jenkins") and Miller and applies in connection with testimony and other lawful discovery obligations authorized by the Federal Rules of Civil Procedure, in the Lawsuit.

3.   This Limited Waiver does not apply to representation of Miller by attorneys other than Liberty Counsel attorneys or Lindevaldsen (or their respective agents, employees, or agents or employees financed or directed by Liberty Counsel or Lindevaldsen), representation of attorneys who commenced representation of Miller for the first time on or after January 2020, and/or who were attorneys of record in the criminal lawsuit, *United States v. Lisa Miller*, No. 1:14-cr-00175-

RJA-MJR (W.D.N.Y), or the Lawsuit, to include without limiting the foregoing Anthony J.

Biller, Dennis Boyle, Daniel Boyce, Duncan Kilmartin or their firms.

4.   Nothing in this Limited Waiver is intended to imply that Miller had relevant

communications with Liberty Counsel or with Lindevaldsen related to the Lawsuit or that she

has any documents or other discovery materials concerning the same. This waiver is submitted

for the purpose of allowing Jenkins to conduct discovery in the Lawsuit.

By: _____

Lisa Miller

Date: ___3/21/23___

# SETTLEMENT EXHIBIT C

[AM_ACTIVE 404564249_3]

VIRGINIA:

IN THE JUVENILE AND DOMESTIC RELATIONS DISTRICT COURT
TWENTY-FOURTH JUDICIAL DISTRICT
COUNTY OF BEDFORD, VIRGINIA

JANET JENKINS                       )
     Petitioner,              )
                    )   DOCKET NO: JJ019920-01-00
                    )
v                                   )
                    )
LISA MILLER                         )
     Respondent,             )
                    )

---

## <u>JOINT MOTION TO VACATE ORDER FOR CIVIL SANCTIONS</u>

Janet Jenkins, Petitioner, and Lisa Miller, Respondent, respectfully move the Court to vacate the August 28, 2009 order of the Juvenile and Domestic Relations District Court of Frederick County, Virginia, JJ018902-01F, JA013947-02F for Civil Contempt Fine against Lisa Miller, and dismiss this action in its entirety, with prejudice, in accordance with the Mutual Release set forth in Paragraph 17, below.

1. Jenkins and Miller were involved in a multistate child custody and visitation dispute from beginning in November 2003 with a dissolution of a civil union filed in the Rutland Vermont Family Court, Docket No. 454-11-03Rddm.

2. A child, known as "IMJ" in Vermont and Virginia court proceedings was born in April 2002 during the civil union. IMJ is no longer a minor but wishes to maintain her privacy.

3. The Rutland Vermont Family Court issued a series of visitation orders which Jenkins registered in Virginia.

1

4.   On August 25, 2009, the Juvenile and Domestic Relations District Court of Frederick County, Virginia, held a hearing upon a Show Cause Summons issued upon Jenkins's complaint that Miller had violated the Vermont visitation orders previously registered in the Fredrick County Court.

5.   On August 28, 2009, the Fredrick County Court found Miller "guilty of civil contempt for failing to deliver [IMJ] for visitation; as a coercive sanction, to compel compliance with the Orders of the Family Court of Rutland, Vermont, Ms. Miller shall pay a civil fine of $100 for each and every day that she fails to deliver the child to Ms. Jenkins for days the Vermont Court has either now or hereafter ordered the child to be with Ms. Jenkins. Said civil fine shall be payable to Janet Jenkins."

6.   In same order, Fredrick County Court transferred jurisdiction "of all matters pertaining to the custody and visitation of [IMJ] . . . to the Juvenile and Domestic Relations District Court for Bedford County, Virginia."

7.   The Bedford County Court assigned the case number JJ019920-01-00.

8.   Upon information and belief, the Juvenile and Domestic Relations District Court for Bedford County, Virginia destroyed their file in this matter pursuant to Va. Code Ann §16.1-306 and 16.1-69.55 upon IMJ turning 19, given that no hearings had occurred within 5 years.

9.   On September 21, 2009, Miller left the United States with IMJ. Subsequently, on November 20, 2009, the Rutland Vermont Family Court transferred physical custody and legal custody of IMJ to Jenkins.

10. When Miller and IMJ were not found within the jurisdiction of Virginia or Vermont, Jenkins filed a civil lawsuit, *Jenkins v. Miller et al*, 2:12-cv-00184-wks, in the United States District Court of Vermont against Miller and other defendants for intentionally kidnapping IMJ

2

and continued detention outside the State of Vermont and for damages related to the denial of Jenkins's parent-child relationship rights.

11.  In 2014, the United States filed criminal charges against Miller under 18 U.S.C. § 1204 and 18 U.S.C. § 2 for International Parental Kidnapping, *United States v. Lisa Miller*, 1:14CR00175-001 in the United States District Court of the Western District of New York.

12. In April 2020, IMJ reached her majority and Miller cannot comply with parent-child ordered contact or purge the contempt by compliance with the parent-child contact orders or the order transferring custody.

13. In January 2021, Miller voluntarily turned herself in to United States authorities and was incarcerated. On May 27, 2022, Miller pleaded guilty, received a sentence of time served and one (1) year of supervised release.

14. In cases of civil contempt, the sanctions should be terminated upon compliance with the order by the contemnor, or at such time as it becomes impossible for the contemnor to purge the contempt. *Mills v. Mills*, 70 Va. App. 362, 374 (2019).

15. The Civil contempt fine was payable to Jenkins in order to compel Miller's compliance with court orders.

16. Miller has "paid" for her failure to comply with court ordered visitation and custody with incarceration. Further, Miller and Jenkins have entered into a private settlement agreement in full resolution of their disputes. The settlement included a comprehensive, mutual release of all legal claims and liabilities.

17. Mutual Release. The Parities, in the above titled matter, on behalf of themselves, their successors, heirs, administrators, executors, or assigns, hereby release and discharge the other Party, to include the other Party's agents and assignees, from all known and unknown charges,

3

complaints, claims, grievances, liabilities, obligations, promises, agreements, civil or criminal

contempt orders and findings, controversies, damages, actions, causes of action, suits, rights,

demands, costs, losses, debts, penalties, fees (including attorneys' fees and costs actually

incurred), and punitive damages, of any nature whatsoever, known or unknown, which either

Party has, or may have had, against the other Party, whether or not apparent or yet to be

discovered, to include, but not limited to, all claims in or in any way related to the above titled

matter, and all matters related thereto. This Agreement resolves any claim for relief, or

enforcement of judicial orders, by civil or criminal contempt or otherwise, that has been, is, or

could have been made or alleged no matter how characterized, including, without limitation,

compensatory damages, damages for breach of contract, bad faith damages, reliance damages,

liquidated damages, damages for humiliation and embarrassment, punitive damages, civil or

criminal contempt, costs, and attorneys' fees related to or arising from the above titled action.

WHEREFORE, Jenkins and Miller respectfully request the Court to vacate the Order for the

Civil Contempt Sanctions and dismiss the case with prejudice.

Respectfully submitted this the _____ day of March 2023.

By: _____
     Mark A. Stallings, Esq.
     The Hunter Law Firm
     3800 Poplar Hill Road, Suite G.
     Chesapeake, VA 23321
     Email: mstallings@hunterlawfirm.com
     Attorneys for Respondent Lisa Miller

By: _____
     Eden Heilman, Esq.
     ACLU of Virginia
     P.O. Box 26464
     Richmond, VA 23261
     Attorneys for Petitioner Janet Jenkins

4

VIRGINIA:

## IN THE JUVENILE AND DOMESTIC RELATIONS DISTRICT COURT
## TWENTY-FOURTH JUDICIAL DISTRICT
## COUNTY OF BEDFORD, VIRGINIA

| | | |
|---|---|---|
| JANET JENKINS | ) | |
| Petitioner | ) | |
| | ) | DOCKET NO: JJ019920-01-00 |
| | ) | |
| v | ) | |
| | ) | |
| LISA MILLER | ) | |
| Respondent | ) | |
| | ) | |

ORDER

The Court, having reviewed the Joint Motion to Vacate Order for Civil Sanctions submitted by the Petitioner and Respondent, for good cause shown, hereby GRANTS the Motion in its entirety.

IT IS THEREFORE, ORDERED, that the Civil Sanctions and Fines in the above-captioned lawsuit is hereby VACATED and the case DISMISSED WITH PREJUDICE.

This the _____ day of _____ 20__

_____

1

# SETTLEMENT EXHIBIT D

**STATE OF VERMONT**
**RUTLAND COUNTY**

| | | |
|---|---|---|
| **LISA MILLER,** | ) | **Rutland Family Court** |
| | ) | **Docket No. 454-11-03Rddm** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JANET JENKINS,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

### JOINT MOTION TO QUASH BENCH ARREST WARRANT

NOW COMES, Lisa Miller, Plaintiff, and Janet Jenkins, Defendant, and respectfully moves the Court to Quash the Bench Arrest Warrant for the arrest of Lisa Miller issued on February 24, 2010 in this case, and dismiss this action in its entirety, with prejudice, in accordance with the Mutual Release set for in Paragraph 19, below.

1. Jenkins and Miller were involved in a multistate child custody and visitation dispute beginning in November 2003 with a dissolution of a civil union filed in the Rutland Vermont Family Court, Docket No. 454-11-03Rddm.

2. A child, known as "IMJ" in Vermont and Virginia court proceedings was born in April 2002 during the civil union. IMJ is no longer a minor but wishes to maintain her privacy.

3. On May 28, 2009, Jenkins filed a Motion to Modify Parental Rights and Responsibilities.

4. On June 19, 2009, the Court issued an order scheduling the motion for a hearing and appointing IMJ a Guardian ad Litem.

5. On August 21, 2009, the case was set for a full-day contested hearing.

1

6. On September 4, 2009, the Court held a status conference hearing and ordered Miller to have IMJ at Jenkins' mother's home for a three-day visit for the weekend of September 25, 2009.

7. On September 21, 2009, Miller left the United States with IMJ.

8. On October 7, 2009, counsel for Jenkins notified the Court that visitation had not occurred.

9. On November 20, 2009, the Court entered an order granting Jenkins' Motion to Modify Parental Rights and Responsibilities, giving Jenkins sole physical and legal custody of the minor child IMJ, and ordering the transfer of IMJ at the home of Jenkins' parents in Virginia on January 1, 2010 at 1:00 pm.

10. The transfer did not occur. On January 4, 2010, Jenkins filed an Emergency Motion for Contempt and an Emergency Motion for Sanctions, and an Emergency Motion for Enforcement.

11. The Court set a hearing for the motions for January 22, 2010. At that hearing, Miller did not appear and her attorneys represented to the Court that they had not heard from Miller. The Court made findings on the record of intentional noncompliance and ordered Miller to appear at the Rutland Family Court on February 23, 2010 with the minor child.

12. On February 23, 2010, Miller failed to appear and the Court issued a bench warrant for the arrest of Lisa Miller. The warrant did not list "offenses" nor check a box indicating the arrest was for a felony or misdemeanor. Upon information and belief, there arrest warrant was for civil contempt. There is no statute of limitations for an arrest warrant.

13. When Miller and IMJ were not found within the jurisdiction of Virginia or Vermont, Jenkins filed a civil lawsuit, *Jenkins v. Miller et al.*, 2:12-cv-00184-wks, in the United States District Court of Vermont against Miller and other defendants for intentionally kidnapping IMJ

2

and continued detention outside the State of Vermont and for damages related to the denial of Jenkins's parent-child relationship rights.

14. In 2014, the United States filed criminal charges against Miller under 18 U.S.C. § 1204 and 18 U.S.C. § 2 for International Parental Kidnapping, *United States v. Lisa Miller*, 1:14CR00175-001 in the United States District Court of the Western District of New York.

15. In April 2020, IMJ reached her majority and Miller could no longer comply with parent-child ordered contact.

16. In January 2021, Miller voluntarily turned herself in to United States authorities and was incarcerated. On May 27, 2022, Miller pleaded guilty, received a sentence of time served and one (1) year of supervised release.

17. In cases of civil contempt, the sanctions should be terminated upon compliance with the order by the contemnor, or at such time as it becomes impossible for the contemnor to purge the contempt. *See Miller v. Miller*, 184 Vt. 464, 483-84, 965 A.2d 524, 537 (2008).

18. Miller is unable to purge the contempt by complying with the order to transfer custody of IMJ to Jenkins because IMJ is no longer a minor.

19. Mutual Release. The Parties, in the above titled matter, on behalf of themselves, their successors, heirs, administrators, executors, or assigns, hereby release and discharge the other Party, to include the other Party's agents and assignees, from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, civil or criminal contempt orders and findings, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees (including attorneys' fees and costs actually incurred), and punitive damages, of any nature whatsoever, known or unknown, which either Party has, or may have had, against the other Party, whether or not apparent or yet to be

discovered, to include, but not limited to, all claims in or in any way related to the above titled matter, and all matters related thereto. This Agreement resolves any claim for relief, or enforcement of judicial orders, by civil or criminal contempt or otherwise, that has been, is, or could have been made or alleged no matter how characterized, including, without limitation, compensatory damages, damages for breach of contract, bad faith damages, reliance damages, liquidated damages, damages for humiliation and embarrassment, punitive damages, civil or criminal contempt, costs, and attorneys' fees related to arising from the above titled action.

WHEREFORE, Jenkins and Miller respectfully move the Court to Quash the Bench Arrest Warrant, and dismiss with prejudice the action in its entirety, in accordance with the Mutual Release set forth in Paragraph 19.

Date _____     _____
                                      Duncan F. Kilmartin, Esq.
                                      Rexford & Kilmartin, P.C.
                                      P.O. Box
                                      Newport, VT 05855-0010
                                      Attorney for the Plaintiff, Lisa Miller

        3/15/23                       _____
                                      Sarah Star, Esq.
                                      Sarah Star, PC
                                      P.O. Box 106
                                      Middlebury, VT 05753
                                      (802) 385-1023
                                      Attorney for the Defendant, Janet Jenkins

4

# STATE OF VERMONT
# RUTLAND COUNTY

**LISA MILLER,**          )          **Rutland Family Court**
                         )          **Docket No. 454-11-03Rddm**
      **Plaintiff,**          )
                         )
        **v.**          )
                         )
**JANET JENKINS,**          )
                         )
      **Defendant**          )
                         )

# ORDER

The Court, having reviewed the Joint Motion to Quash the Bench Arrest Warrant and Dismiss with Prejudice submitted by the Plaintiff and Defendant, for good cause shown, hereby GRANTS the Motion in its entirety.

IT IS THEREFORE, ORDERED, that the Bench Arrest Warrant in the above-captioned lawsuit is hereby QUASHED and the case DISMISSED WITH PREJUDICE.

This the _____ day of _____ 20__

_____

[AM_ACTIVE 404564248_3]